# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IWA-FOREST INDUSTRY PENSION PLAN, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>D-MARKET ELEKTRONIK HIZMETLER VE TICARET ANONIM ŞIRKETI a/k/a D-MARKET ELECTRONIC SERVICES & TRADING d/b/a/ HEPSIBURADA, MEHMET MURAT EMIRDAĞ, HALIL KORHAN ÖZ, HANZADE VASFIYE DOĞAN BOYNER, ERMAN KALKANDELEN, MEHMET EROL ÇAMUR, CEMAL AHMET BOZER, VUSLAT DOĞAN SABANCI, MUSTAFA AYDEMIR, TOLGA BABALI, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, GOLDMAN, SACHS & CO. LLC, BOFA SECURITIES, INC. UBS SECURITIES LLC, and TURKCOMMERCE B.V.,<br>                    Defendants. | Honorable P. Kevin Castel<br>Civ. A. No. 1:21-cv-08634-PKC<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Frederic S. Fox
Donald R. Hall
Jeffrey P. Campisi
Pamela A. Mayer
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022

*Attorneys for Lead Plaintiff IWA-Forest Industry Pension Plan and the Proposed Class*

February 4, 2022

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION AND OVERVIEW ............................................................ 1

II.   JURISDICTION AND VENUE ................................................................................... 8

III.  PARTIES ..................................................................................................................... 9

IV.   SUBSTANTIVE ALLEGATIONS ........................................................................... 12

    A.    Background ....................................................................................................... 12

    B.    The Company's Materially False and/or Misleading Registration
          Statement ........................................................................................................... 14

V.    POST-IPO EVENTS ................................................................................................. 21

    A.    Disclosure of Pre-IPO Decline in KPIs ......................................................... 21

    B.    Disclosure of Pre-IPO Strategic Margin Investment and Discounts ..................... 23

    C.    Disclosure of Pre-IPO Shift to Low Margin Products ........................................... 23

VI.   CLASS ACTION ALLEGATIONS .......................................................................... 25

    FIRST CLAIM  Violation of Section 11 of the Securities Act
    (Against All Defendants) ............................................................................................. 27

    SECOND CLAIM  Violation of Section 12(a)(2) of the Securities Act
    (Against all the Underwriter Defendants) ................................................................... 29

    THIRD CLAIM  Violation of Section 15 of the Securities Act
    (Against the Individual Defendants) ........................................................................... 31

VII.  PRAYER FOR RELIEF ........................................................................................... 32

VIII. JURY TRIAL DEMANDED .................................................................................... 32

Lead Plaintiff IWA-Forest Industry Pension Plan ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by D-MARKET Elektronik Hizmetler ve Ticaret Anonim Şirketi a/k/a D-MARKET Electronic Services & Trading d/b/a/ Hepsiburada ("Hepsiburada" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Hepsiburada; and (c) review of analyst reports and other publicly available information concerning Hepsiburada.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Hepsiburada American Depositary Shares ("ADSs") pursuant and/or traceable to the Registration Statement and Prospectus (defined below) issued in connection with the Company's July 2021 initial public offering ("IPO" or the "Offering"). This action asserts strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o, against Hepsiburada, the underwriters for the IPO and certain Hepsiburada officers, directors, representatives, and significant shareholders.

2.      Defendants are the Company, Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Goldman, Sachs & Co. LLC, BofA Securities, Inc. and UBS Securities LLC (the "Underwriter Defendants"), Mehmet Murat Emirdağ, Halil Korhan Öz, Hanzade Vasfiye Doğan Boyner, Erman Kalkandelen, Mehmet Erol Çamur, Cemal Ahmet Bozer, Vuslat Doğan Sabanci, Mustafa Aydemir, Tolga Babali, Colleen A. De Vries (the "Individual Defendants"), Cogency

Global Inc. ("Cogency") and TurkCommerce B.V. ("TurkCommerce"), a selling shareholder in the IPO.

3.    Hepsiburada operates an e-commerce platform in Turkey and claims that as of 2020 it was the number two player with 17% of the total e-commerce market in Turkey.

4.    On May 28, 2021, Defendants caused the Company to file a registration statement with the SEC on Form F-1 that was signed by the Individual Defendants.  The registration statement was subsequently amended and was declared effective by the SEC on June 30, 2021. On July 1, 2021, Defendants caused the Company to file a final prospectus on Form 424B4 with the SEC (the "Prospectus"), which forms part of the registration statement.  Collectively, the Prospectus and effective registration statement are referred to as the "Registration Statement".

5.    The Registration Statement represented the Company was experiencing and would continue to experience extraordinary sales growth and operational health at the time of the IPO based on a number of key operating performance indicators ("KPIs").  The KPIs heavily emphasized throughout the Registration Statement included revenue growth, growth in Gross Merchandise Value ("GMV"), which refers to the total value of orders/products sold through the Company's platform over a given period of time, Gross Contribution, Gross Contribution Margin[1], EBITDA[2], and EBITDA as a percentage of GMV.  The Registration Statement represented that the positive KPI trends, which included 145% revenue growth and 111% GMV growth in 2020,

---

[1]    According to the Prospectus, Gross Contribution is calculated as revenues less cost of inventory sold and "is an indicator of [the Company's] operational profitability as it reflects the direct costs of products sold to [the Company's] buyers."  Gross Contribution Margin is gross contribution represented as a percentage of Gross Merchandise Value, or GMV.
[2]    EBITDA represents operating performance that stands for Earnings Before Interest, Taxes, Depreciation and Amortization.  In the Prospectus for the IPO, the Company said that Company management uses EBITDA "as a measurement of operating performance because it assists us in comparing our operating performance on a consistent basis, as it removes the impact of non-cash and non-operating items."

would continue.  For example, the Registration Statement represented:

> "As we continue to scale up Hepsiburada, *we believe that these trends will continue to positively impact our business* . . . increasing operational efficiency *driving improvement in unit economics and profitability*."  [Emphasis added.]

6.     Additionally, the Company purported to warn of a number of potentially negative trends, for example that *"[r]evenue growth may slow down or decline*." [Emphasis added.]

7.     However, unknown to investors, the Registration Statement was materially false and misleading and omitted to state that (1) Hepsiburada suffered a material deceleration in customer and merchant activity and corresponding decline in revenue growth on its platform during its second quarter of 2021 (April 1, 2021 through June 30, 2021 "hereafter 2Q 2021"), which ended the day before the July 1, 2021 IPO, and that (2) because of this significant deceleration, in an effort to stimulate consumer and merchant activity on the Company's platform and continue KPI growth, in Q2 2021 the Company initiated "strategic margin investments", "discounts" to customers for marketing campaigns, and heavy promotion of low margin goods.

8.     The strategic margin investments, discounts and advertising promotions were cash-burning and expensive, involving materially increased spending by the Company to promote lower margin and high frequency categories and attract more customers to its platform, and monetary incentives to merchants in an effort to attract and keep merchants on the Company's platform.  Despite these efforts, prior to the Offering, the Company's revenue and GMV growth sharply decelerated.

9.     The Registration Statement does not disclose the rapid deceleration in revenue and GMV growth during 2Q 2021, which had already ended, nor does it mention Defendants' attempts to mitigate those trends during 2Q 2021 through strategic margin investments, discounts and promotion of low margin goods or any other such plans that prioritized GMV growth based on drastic margin cuts.   To the contrary, the Registration Statement represented that the positive

trends in KPIs would continue.

10.     As a result of the undisclosed actions by Hepsiburada to mitigate the undisclosed negative trends, during 2Q 2021 which had ended prior to the IPO, Hepsiburada's KPIs, including revenue and GMV growth, gross contribution margin, EBITDA, and EBITDA as a percent of GMV, all materially declined reflecting the Company's operational deterioration.

11.     In the July 1, 2021 IPO conducted pursuant to the Registration Statement, 41,670,000 ADSs were offered and sold by Hepsiburada and 23,581,000 ADSs were offered and sold by Defendant TurkCommerce, which included 8,511,000 ADSs sold by Defendant TurkCommerce pursuant to the Underwriter Defendants' exercise in full of their over-allotment option, at a price of $12.00 per ADS. Each ADS represents one Class B ordinary share. The ADSs began trading on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "HEPS" on July 1, 2021.

12.     The Company received proceeds of approximately $500,040,000 before the underwriting discount and expenses from the Offering. The proceeds from the IPO were purportedly to be used for general corporate purposes, including working capital, operating expenses, and capital expenditures.  TurkCommerce sold 23,581,000 ADSs at $12 per ADSs in the IPO for estimated proceeds of $282,972,000 before the underwriting discount and expenses from the Offering.

13.     On August 26, 2021, just 8 weeks after the Offering, Hepsiburada announced its Q2 2021 financial results—the quarter that ended on June 30, 2021 *before the IPO closed*.  In both the press release and conference call reporting Q2 2021 results on August 26, 2021, the Company revealed that its business, operations, financial results and sales were falling off a cliff, decreasing materially prior to the IPO after it had *already, during 2Q 2021,* implemented strategic

margin investments, discounts and heavy promotion of low margin goods.[3]

14.    On August 26, 2021, in the Company's press release and conference call reporting Q2 2021 financial results, investors learned that the Company had undertaken the previously undisclosed actions to mitigate the negative trends in the quarter *before the IPO*, all of which drove increased traffic and pumped-up sales and GMV at the expense of margins.   Specifically, Hepsiburada reported the existence of the following negative trends, deterioration of KPIs, and mitigating actions in the quarter *before the IPO*:

- In Q2 2021 revenue growth decelerated to a mere 5% compared to 66% revenue growth in the first quarter 2021 ("Q1 2021") measured on a year-over-year basis[4], and GMV growth decelerated to 38% from 95% in Q1 2021 measured on a year-over-year basis.

- The Company reported a 2.4% decline in its gross contribution margin to 8.3% in Q2 2021 compared to 10.7% in the first quarter of 2020 ("Q1 2020") "*mainly due to underlying dynamics in revenue growth*."  [Emphasis added.]

- Hepsiburada admitted that the 2.4% decline in gross contribution margin was "driven by strategic margin investments with shift in electronics GMV to 3P and the discounts given to our customers for temporary marketing campaigns" in Q2 2021 *before* conducting the IPO.

- Additionally, the Company reported a materially negative change to the Company's EBITDA mostly as a result of the strategic margin investments and higher customer

---

[3]    Hepsiburada press release dated August 26, 2021 and Conference Call held on August 26, 2021.

[4]    Year-over-year refers to the fact that the comparison is being made to the comparable quarter of the prior year.

demand for low margin products ***before*** the IPO.  The Company's EBITDA was "negative TRY 188.6 million in Q2 2021 compared to positive TRY 71.1 million in Q2 2020 . . . due to lower gross contribution driven primarily by investments to fortify our market position in electronics, investments to penetrate in high frequency categories as well as higher  customer demand for low margin products."[5]

15.    Moreover, the Registration Statement failed to disclose that the Company had been adversely affected by a significant slowdown in sales after the lifting of all Covid lockdown restrictions in early March 2021 prior to the Offering.   In fact, the President of Turkey lifted virtually all lockdown restrictions as of March 2, 2021 (before the start of Q2 2021)[6], which in turn had led consumers back to shopping in physical stores and a corresponding sharp slowdown in online e-commerce at least by the start of Q2 2021 and certainly by the end of Q2 2021 as evidenced by the decline in the Company's key operating performance metrics.

16.    Following the Company's publication of its Q2 2021 financial results, analysts covering the Company were surprised by the slowdown in revenues, increased costs and lower margins only weeks after the IPO.  A report on the Company by Defendant Morgan Stanley dated

---

[5]    TRY is the abbreviation for the Turkish lira.

[6]    Turkish President Erdoğan announced a "gradual normalization" process on March 2, 2021 whereby the government removed almost all restrictions limiting the spread of COVID-19 as part of a "herd immunity" policy. *See* "As public health organizations call for lockdown, Turkish government removes COVID-19 restrictions," WSWS.org, March 5, 2021; *See also* Lexology.com, "Coronavirus restrictions for a new controlled normalization process," March 5, 2021 (On Monday March 1, 2021, the weekend lockdowns in cities with low and medium infection rates were lifted, allowing shopping and most other activities to resume between 10am and 8pm on weekdays. On March 2, 2021, pursuant to the "Circular on the Measures To Be Taken According to Risk Groups" issued by the Ministry of Interior Affairs in accordance with the decisions of President Erdoğan at a cabinet meeting on March 1, 2021, certain remaining restrictions were to be partially removed or mitigated allowing shopping centers and other business to operate on Saturdays until 8pm.)

August 26, 2021 titled "2Q21 Results:  Topline and EBITDA Miss" states "GMV came 3% lower than our expectations while Adj. EBITDA was 31% below."

17.     The negative impact of the strategic margin investments, heavy promotion of low margin goods, and discounts to customers continued in the third quarter of 2021 ("Q3 2021"), as evidenced by the Company's Q3 2021 financial results reported on November 12 and November 23, 2021.

18.     On November 12, 2021, the Company issued a press release warning investors that its third quarter results "were unfavorably impacted by a combination of factors, mainly the slowdown in market growth rate and intensified competition."

19.     The full continued negative impact of the actions taken by Hepsiburada to counteract slowing revenue growth that started *before the IPO* was revealed on November 23, 2021.  Revenue growth in Q3 2021 was negative 0.8%, much worse than even the paltry 5% growth in Q2 2021, gross contribution margins fell to 4.3% in Q3 2021 from 8.3% reported for Q2 2021, and the Company reported substantially lower EBITDA of negative TRY 698.8 million in Q3 2021 compared to EBITDA of positive TRY 8.9 million in Q3 2020 and EBITDA of negative TRY 189 million in Q2 2021.  While GMV growth increased by 50% year-over-year to TRY 6.5 million, better than the 38% GMV growth year-over-year in Q2 2021, this reflected the Company's ultra-low commission rates to pump-up third-party marketplace sales and GMV, along with increased customer discounts, cutting into margins and causing revenues to shrink rather than grow.  In fact, the Company admitted during the Q3 2021 conference call that "[t]hese results indicate that *cost of growth was higher, primarily driven by the increase in customer discounts, advertising spend and unit cost of marketing*." [Emphasis added.]

20.     As of February 4, 2022, the Company's ADSs closed at $1.94 per ADS, a nearly

84% decline from the $12 per ADS IPO price.

21.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     <u>**JURISDICTION AND VENUE**</u>

22.     The claims asserted herein arise under and pursuant to Sections 11, 12 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o).

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

24.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b).

25.     The Bank of New York Mellon, which maintains its headquarters in this District, is the holder of the ordinary shares underlying the Company's ADSs.  The Bank of New York Mellon is the transfer agent and depositary for the Company's ADSs.

26.     Each of the Underwriter Defendants maintains an office in this District.

27.     The Company's ADSs trade on the Nasdaq which is headquartered in this District. The Registration Statement provides that the Company's agent for service of process in the U.S. is Cogency Global Inc., 122 East 42nd Street, 18th Floor, NY, NY 10168, which is in this District.

28.     Under the Underwriting Agreement, attached as an Exhibit to the Registration Statement ("Underwriting Agreement"), the Company and Defendant TurkCommerce all irrevocably submitted to the jurisdiction of this Court and venue in this District.

29.     The Individual Defendants caused the Underwriting Agreement to be executed on behalf of the Company and took acts in furtherance of closing the IPO through the Underwriters under the Underwriting Agreement, therefore each of the Individual Defendants submitted to the jurisdiction of this Court and venue in this District under the Underwriting Agreement.

30.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

III.    **PARTIES**

31.     Plaintiff, as set forth in the certification attached hereto and previously filed with the Court (ECF No. 20-2) incorporated by reference herein, purchased Hepsiburada ADSs pursuant or traceable to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

32.     Defendant Hepsiburada is incorporated under the laws of Turkey with its principal executive offices located in Istanbul, Turkey. Hepsiburada's ADSs trade on the Nasdaq exchange under the symbol "HEPS." The Company was established in 2000 and as of the date of the IPO, the Company operates as a retail website (www.hepsiburada.com) offering its retail customers a wide selection of merchandise including electronics and non-electronics (including books, sports, toys, kids and baby products, cosmetics, furniture, etc.). Prior to the Offering, as of March 31, 2021, the ultimate shareholders of the Company were Defendant Hanzade Vasfiye Doğan Boyner ("Boyner") and other members of the Doğan family, and Defendant TurkCommerce B.V.

33.     Defendant Mehmet Murat Emirdağ ("Emirdağ") was, at all relevant times, the Company's founder, Chief Executive Officer ("CEO") and a director of the Company, and signed and reviewed the Company's Registration Statement filed with the SEC.

34.     Defendant Halil Korhan Öz ("Öz") was, at all relevant times, the Chief Financial Officer ("CFO") and a director of the Company, and signed and reviewed the Company's

Registration Statement filed with the SEC.

35.     Defendant Boyner was, at all relevant times, Chairwoman of the Company and signed and reviewed the Company's Registration Statement filed with the SEC.

36.     Defendant Erman Kalkandelen ("Kalkandelen") was, at all relevant times, Deputy Chair of the Company and signed and reviewed the Company's Registration Statement filed with the SEC.

37.     Defendant Mehmet Erol Çamur ("Çamur") was, at all relevant times, a director of the Company and signed and reviewed the Company's Registration Statement filed with the SEC.

38.     Defendant Cemal Ahmet Bozer ("Bozer") was, at all relevant times, a director of the Company and signed and reviewed the Company's Registration Statement filed with the SEC.

39.     Defendant Vuslat Doğan Sabanci ("Sabanci") was, at all relevant times, a director of the Company and signed and reviewed the Company's Registration Statement filed with the SEC.  Defendant Boyner and Defendant Sabanci are siblings.

40.     Defendant Mustafa Aydemir ("Aydemir") was, at all relevant times, a director of the Company and signed and reviewed the Company's Registration Statement filed with the SEC.

41.     Defendant Tolga Babali ("Babali") was, at all relevant times, a director of the Company and signed and reviewed the Company's Registration Statement filed with the SEC.

42.     Defendant Colleen A. De Vries ("De Vries") was, at all relevant times, the Senior Vice President for Defendant Cogency, the duly authorized United States representative of the Company, and signed and reviewed the Company's Registration Statement

filed with the SEC as the Senior Vice President of Defendant Cogency.

43.     Defendant Cogency is located in New York, New York and is the duly authorized United States representative of the Company.  Defendant De Vries, the Senior Vice President of Cogency, signed the Registration Statement on behalf of Defendant Cogency.

44.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley"), with an office at 1585 Broadway, NY, NY 10036, served as an underwriter for the Company's IPO. In the IPO, Morgan Stanley agreed to purchase 23,263,400 Hepsiburada ADSs, exclusive of the over-allotment option.

45.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan"), with an office at 383 Madison Avenue, NY, NY 10179 served as an underwriter for the Company's IPO. In the IPO, J.P. Morgan agreed to purchase 19,859,000 Hepsiburada ADSs, exclusive of the over-allotment option.

46.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs"), with an office at 200 West Street, Ny, NY 10282, served as an underwriter for the Company's IPO. In the IPO, Goldman Sachs agreed to purchase 9,078,400 Hepsiburada ADSs, exclusive of the over-allotment option.

47.     Defendant BofA Securities, Inc. ("BofA"), with an office at One Bryant Park, NY, NY 10036, served as an underwriter for the Company's IPO. In the IPO, BofA agreed to purchase 2,269,600 Hepsiburada ADSs, exclusive of the over-allotment option.

48.     Defendant UBS Securities LLC ("UBS"), with an office at 1285 6th Avenue, NY, NY 10019, served as an underwriter for the Company's IPO.  In the IPO, UBS agreed to purchase 2,269,600 Hepsiburada ADSs, exclusive of the over-allotment option.

49.     Defendants Morgan Stanley, J.P. Morgan and Goldman Sachs acted as

representative of the Underwriter Defendants. The Underwriter Defendants acted as the underwriters of the IPO Offering by offering, selling and distributing the Company's ADSs offered to the investing public and purchased by Plaintiff and members of the Class.

50.     As a result, each of the Underwriter Defendants was obligated under the federal securities laws to conduct a reasonable investigation into the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Registration Statement and under the Securities Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement.   Any reasonable investigation would have entailed a review of the current status of the Company's business, operations, condition and prospects. Such a review, in turn, would have revealed that the Registration Statement contained material misrepresentations, as alleged herein.

51.     Defendant TurkCommerce, a special purpose investment vehicle incorporated under the laws of the Netherlands, is beneficially owned and controlled by Templeton Turkey Fund GP Ltd. and is managed pursuant to a limited partnership agreement among Templeton Turkey Fund GP Ltd., Templeton Turkey Fund, L.P. and Templeton Asset Management Ltd. (collectively, "Templeton Turkey").   TurkCommerce is located at Amstelveenseweg 760, 1081JK Amsterdam.  Defendants Kalkandelen and Aydemir are directors of TurkCommerce, and Templeton Turkey's representatives on the Company's board of directors. Through the Underwriter Defendants, TurkCommerce sold 23,581,000 ADSs at $12 per ADSs in the IPO for estimated proceeds of $282,972,000 before the underwriting discount and expenses.

## IV.     **SUBSTANTIVE ALLEGATIONS**

### A.     **Background**

52.     Hepsiburada, established over 20 years ago, operates an e-commerce platform in Turkey, where it is one of the dominant e-commerce players in the Turkish market.  Hepsiburada

claims to be the second largest e-commerce player with a 17% share of the online shopping market in Turkey.[7]

53.     Hepsiburada's revenues are derived from a hybrid of first-party direct sales, or "1P" sales, and third-party "marketplace" sales by merchants, or "3P" sales.   For 1P sales, Hepsiburada's revenue is recognized on a gross basis from selling goods directly to customers on its platform.   For 3P sales, Hepsiburada's revenue is recognized in the form of commissions, transaction fees and other contractual charges when a merchant makes a sale on the Company's platform.   In addition to 1P and 3P revenues, Hepsiburada also tracks "Gross Merchandise Value", or GMV, which as explained above in ¶ 5 refers to the total value of orders/products sold through the Company's platform over a given period of time.

54.     In 2020, as the Covid-19 pandemic took hold in Turkey, online shopping in Turkey surged due to the significant lockdown measures that went into effect in Turkey starting in March 2020.   According to Turkey's Trade Minister, Ruhsar Pekcan, who conducted a news conference on April 6, 2021, "E-commerce spending to gross domestic product (GDP) ratio reached 4.1 percent in 2020, a rise of 51.8 percent from a year [earlier]."   Additionally, "the number of companies engaged in e-commerce operations in Turkey also surged by 275 percent to 256,861 [in 2020], an indicator of the dynamic development of the sector in the country. . . ."   While e-commerce volume in Turkey was surging, Hepsiburada's 2020 revenues grew by 145% and GMV grew by 111% as set forth in the Registration Statement.

55.     In mid-January 2021, Turkish President Erdoğan announced a plan to lift many of the lockdown restrictions.   By March 2, 2021, most of the restrictions were lifted allowing

---

[7]     Prospectus, p.  4, *see also* HSBC Global Research, August 4, 2021.

businesses to reopen and consumers to return to shopping malls.[8]

56.     With a surge in e-commerce that positively impacted the Company's KPIs, on May 28, 2021, Hepsiburada filed the registration statement for its IPO in which the Company touted its ability to continue the extraordinary growth trends it had achieved during the pandemic as evidenced by its unprecedented growth across multiple KPIs, particularly revenue and GMV growth.  Throughout the registration statement the Company repeatedly emphasized its revenue growth of 66% in Q1 2021 measured on a year-over-year basis, GMV growth of 95% in Q1 2021 also measured on a year-over-year basis, and that the Company believed "***these trends will continue to positively impact [its] business***."[9] [Emphasis added.]

**B.     The Company's Materially False and/or Misleading Registration Statement**

57.     On May 28, 2021, the Company filed its Registration Statement on Form F-1 with the SEC, which forms part of the Registration Statement.

58.     On June 17, 2021 and June 23, 2021, the Company filed amendments to the Registration Statement with the SEC on Forms F-1/A, which form part of the Registration Statement. The  Registration Statement was declared effective on June 30, 2021.

59.     On July 1, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold approximately 65,251,000 ADSs at a price of $12.00 per ADS. Each ADS represents one Class B ordinary share. The Company received proceeds of approximately $500 million from the Offering before the underwriting discount and expenses. The proceeds from the IPO were purportedly to be used for general corporate purposes, including working capital, operating expenses, and capital

---

[8]      *See* footnote 5 above.
[9]      *See* Prospectus pp. 9, 130; Registration Statement on Form F-1 dated May 28, 2021, pp. 10 and 116.

expenditures.

60.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

61.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

62.     The Registration Statement repeatedly represented the Company's accelerated revenue and GMV growth was attributable to "meticulous execution," and that these trends were expected to continue, while omitting to inform investors that the growth was primarily attributable to the surge in online shopping in Turkey due to lockdowns during the pandemic and that this growth had materially deteriorated before the IPO as businesses were reopened and citizens were generally allowed to leave their homes for shopping and other nonessential activities starting in March 2021.  The Registration Statement further represented that the positive KPI trends would positively impact Hebpsiburada as it scales up by driving "improvement in unit economics and profitability."   But, unknown to investors, the Company's unit economics and profitability had sharply dropped by the time of the IPO, as evidenced by a 2.4% decline in gross contribution margin and 4.9% decline in EBITDA as a percentage of GMV in Q2 2021, due to strategic margin investments, customer discounts, significantly increased advertising and promotion of low margin goods to counteract very negative revenue and growth trends that had emerged before the IPO.

63.     The Registration Statement represented the following concerning revenue, GMV and represented positive trends in the Company's KPIs:

*"**Highly Attractive Financial Profile with Strong Growth at Scale, High Order Frequency Rates and Attractive Unit Economics**

Our business has grown substantially in recent years. ***Our revenues increased by 66% to TRY 1.4 billion in the three months ended March 31, 2021 from TRY 0.8 billion in the three months ended March 31, 2020 and by 145% to TRY 6.4 billion in 2020 from TRY 2.6 billion in 2019*** and by 33% from TRY 2.0 billion in 2018, and ***our total GMV increased by 95% to TRY 4.5 billion in the three months ended March 31, 2021 from TRY 2.3 billion in the three months ended March 31, 2020, and by 111% to TRY 17.0 billion in 2020 from TRY 8.0 billion in 2019*** and by 56% from TRY 5.1 billion in 2018, as we pursued our significant transformation from a 1P-only business to a hybrid commerce model of 1P and 3P. For the three months ended March 31, 2021, and in 2020, 3P accounted for approximately 70% and approximately 59% of our GMV, respectively.*

\* \* \*

*The growth has been fueled by several factors, including an increased frequency of orders to 3.9 in 2020, up from 3.5 in 2019 and 3.1 in 2018, and an expanding Active Customer base of 9 million in 2020, up from 6.5 million in 2019 and 4.8 million in 2018.*

*As we continue to scale up Hepsiburada, **we believe that these trends will continue to positively impact our business**, with further Active Customer base growth, strong cohort performance and increasing operational efficiency **driving improvement in unit economics and profitability**."*[10] [Emphasis added.]

64.     These representations contained untrue statements of material fact and omitted material facts necessary to make the statements contained therein not misleading because the Registration Statement failed to state: (1) that Hepsiburada suffered a sharp deceleration in revenue and GMV growth during Q2 2021, the quarter ended June 30, 2021 ***before the IPO***; (2) that, as a result, the Company initiated a number of cash burning and margin reducing actions to counteract these very negative trends, including strategic margin investments, discounts to customers for marketing campaigns and significantly increased advertising expense and promotion of low margin goods; (3) that, as a result of Hepsiburada's implementation of these actions

---

[10]     Prospectus, pp. 8-9; similar statements appear on p. 108 of the Prospectus and pp. 10 and 116 of the registration statement on Form F-1 dated May 28, 2021 and throughout the entire Registration Statement the positive KPI trends are frequently repeated.

intended to counteract the very negative growth trends, Hepsiburada's unit economics and profitability materially and sharply declined **before the IPO** as evidenced by declines in gross contribution margin and EBITDA in Q2 2021; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's KPIs, business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

65.     Specifically, by the time of the IPO and as later admitted by the Company, revenue growth measured on a year-over year basis dropped to a mere 5% in Q2 2021 from 66% in Q1 2021 and compared to 145% growth in 2020. Similarly, GMV growth measured on a year-over-year basis dropped to only 38% in Q2 2021 from 95% in Q1 2021 and compared to 111% growth in 2020.

66.     The Registration Statement further represented the following concerning demand for the Company's products and services on its e-commerce platform:

> "[T]he COVID-19 pandemic led consumers in the Turkish market to shift to e-commerce as a result of social distancing measures, with a consequential growth in demand for our products and services. ***This was primarily supported by the change in customer behavior where consumers have adopted online shopping behavior during the pandemic, which we expect to become permanent.*** . . ."[11]  [Emphasis added.]

67.     These representations contained untrue statements of material fact and omitted material facts necessary to make the statements contained therein not misleading because consumers were already shifting away from e-commerce on Hepsiburada's platform as evidenced by the revenue growth of only 5% and GMV growth of only 38% in the quarter before the IPO. Moreover, the implementation of the strategic margin investments and other actions to grow GMV at the expense of margins during Q2 2021 showed that consumer behavior adopting e-commerce

---

[11]     Prospectus, pp. 76; similar statements appear on p. 113 of the Prospectus and pp. 81 and 121 of the registration Statement on Form F-1 dated May 28, 2021, as well as in the amendments on Form F-1/A.

was not permanent and that the Company needed to spend significantly and burn cash to maintain and/or attract consumers and merchants to its platform.

68.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. 929.303 ("Item 303") required the Registration Statement to disclose: (ii) unusual events, transactions or significant economic changes that materially affected the amount of Hepsiburada' reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations.  The material, negative trends, in terms of significantly slowing revenues and GMV growth, as well as the Company's implementation of the strategic margin investments, customer discounts and significantly increased advertising expense that burned cash and materially reduced gross contribution margins, EBITDA and EBITDA as a percent of GMV before the IPO represented unusual events that materially affected the amount of Hepsiburada's reported income and known trends and uncertainties that were required to be disclosed under Item 303 because they were known and reasonably expected to (and did) have a material  unfavorable impact on the Company's net sales, revenues and income from continuing operations

69.     In addition, Item 105 of SEC Regulation S-K, 17 CFR. 5229.105 ("Item 105") required in the "Risk Factors" section of the Registration Statement a discussion of the most significant factors that made the offering risky or speculative and that each risk factor adequately describe the risk.  Because the omitted material facts alleged herein were not disclosed, as well as the consequent material adverse effects on the Company's future results and prospects, Defendants violated Item 105.   For example, the Registration Statement represented certain risks "may" or "could" adversely impact Hepsiburada's business in the future:

- **"We _may_ experience significant fluctuations in our results of operations**

and growth rate.[12]

We have grown significantly in recent years, and we intend to continue to expand the scope and geographic reach of the services we provide. ***Revenue growth may slow down or decline for any number of reasons, including our inability to attract or retain merchants and customers, decreased customer frequency and spending, increased competition, slowing overall growth of the e-commerce market***, the emergence of alternative business models, changes in government policies and general economic conditions." [Emphasis added.]

- **"We face uncertainties relating to the growth and profitability of the e-commerce industry in our region and we *may* face challenges and uncertainties in implementing our e-commerce strategy[13]**

    Our future sales depend substantially on consumers' widespread acceptance and use of e-commerce. While e-commerce has existed in our region for decades, only recently have certain regional e-commerce companies become sizeable. Our future results of operations will depend on numerous factors affecting the development of the e-commerce retail industry in our region, which may be beyond our control."

- **"We operate in a highly competitive market, and in the future we *may* not be able to compete effectively[14]**

    As a result of these various types of current and potential competitors, we may not be able to maintain our leading position or level of traffic on our online platform, we may fail to retain or may lose our current market position, we may fail to continue to attract new and retain our existing customers and merchants, and ***we may be required to increase our spending or maintain lower prices, which could materially and adversely affect our business, prospects, financial condition and results of operations.*"** [Emphasis added.]

- "COVID-19 and the measures taken to limit its spread have impacted consumer behavior, including e-commerce shopping trends. During the COVID-19 pandemic, increased numbers of consumers in the Turkish market have shifted to e-commerce as a result of social distancing and other government restrictions, which resulted in the growth for demand for our products and services. However, customers ***may*** shift back towards offline

---

[12]    Prospectus, pp. 11, 29; similar statements appear on pp. 13 and 32 of the Registration Statement on Form F-1 dated May 28, 2021, as well as in the amendments on Form F-1/A.

[13]    Prospectus, p 36; similar statement appears on p. 40 of the Registration Statement on Form F-1 dated May 28, 2021, as well as in the amendments on Form F-1/A.

[14]    Prospectus, pp. 11, 26-27; similar statements appear on pp. 12 and 29 of the Registration Statement on Form F-1 dated May 28, 2021, as well as in the amendments on Form F-1/A.

retailers as social distancing and government restrictions ease, as a result of which ***we may experience slower than expected growth.***"[15]   [Emphasis added.]

70.     While the Registration statement purported to warn that these risks "may" occur in the future, the Registration Statement failed to disclose that these potential risks had ***already*** occurred and were ongoing at the time of the IPO.  At the time of the IPO, Hepsiburada's revenue and GMV growth had ***already*** ground to a near halt and the Company had ***already*** implemented the strategic margin investments, customer discounts and heavy advertising, which in turn had ***already*** sharply reduced profitability as measured by both gross contribution margin and EBITDA. The Registration Statement's failure to disclose these already existing changes to the Company's revenue growth, GMV growth, gross contribution margin, EBITDA and EBITDA as a percent of GMV, along with the failure to disclose the implementation of the strategic margin investments, customer discounts and a 98% increase in advertising expense in Q2 2021 compared to Q1 2021 rendered the disclosures of potential adverse events that ***may*** occur in the future materially misleading.  Market dynamics had undeniably changed in Q2 2021 – whether due to increased competition or a shift in the e-commerce market as a result of the lifting of lockdown restrictions – leading the Company to take the mitigating actions that had further negative effects in Q2 2021.

71.     The Registration Statement was materially false and misleading and omitted to state: (1) that Hepsiburada suffered a sharp deceleration in revenue and GMV growth during Q2 2021, the quarter ended June 30, 2021 ***before the IPO***; (2) that, as a result, the Company initiated a number of cash burning and margin reducing actions to counteract these very negative trends, including strategic margin investments, discounts to customers for marketing campaigns, and significantly increased advertising expense for growth acceleration; (3) that, as a result of

---

[15]     Prospectus, p. 30; similar statement appears on pp. 33-34 of the Registration Statement on Form F-1 dated May 28, 2021.

Hepsiburada's implementation of these actions intended to counteract the very negative growth trends, Hepsiburada's unit economics and profitability materially and sharply  declined *before the IPO* as evidenced by declines in gross contribution margin and EBITDA in Q2 2021;  and  (4) that, as a result of the foregoing, Defendants' positive statements about the Company's KPIs, business, operations, and prospects, were  materially misleading and/or lacked a reasonable basis.

## V.    POST-IPO EVENTS

72.    On August 26, 2021, less than two months after D-Market's July 1, 2021 IPO, the Company issued a press release and also held a conference call to report its Q2 2021 financial results – *the quarter ending before the IPO*.

73.    As discussed below, the Company admitted that at the time of the IPO, during Q2 2021 - *before the IPO -* the Company's sales growth had ground to a near halt with revenue growth dropping to only 5% in Q2 2021 from 66% and GMV growth dropping to only 38% in Q2 2021 from 95%.

### A.    Disclosure of Pre-IPO Decline in KPIs

74.    The August 26 press release disclosed that in the three months leading up to the IPO, its strong growth trends had dramatically slowed.  Notably, revenue growth measured on a year-over-year basis dropped from 66% in Q1 2021 to a mere 5% in Q2 2021.  Similarly, GMV growth measured on a year-over-year basis dropped from 95% in Q1 2021 to only 38% in Q2 2021 as shown below.[16]

---

[16]    Chart prepared from financial information in the Registration Statement and in the Company's August 26, 2021 Press Release.

|  | Q1 2021 | Q2 2021 |
|---|---|---|
| **Revenue (in TRY)** | 1.4 billion | 1.75 billion |
| **Revenue growth (yoy)** | 66% | 5% |
| **GMV (in TRY)** | 4.5 billion | 5.9 billion |
| **GMV growth (yoy)** | 95% | 38% |

75.     Additionally, the Company's August 26 press release revealed that Hepsiburada had suffered a sharp drop in profitability in Q2 2021 on a year-over-year basis as measured by gross contribution margin as a percent of GMV, EBITDA and EBITDA as a percent of GMV.[17]

|  | Q2 2020 | Q2 2021 |
|---|---|---|
| **Gross Contribution (in TRY)** | 452.3 million | 486.9 million |
| **GMV (in TRY)** | 4.2 billion | 5.9 billion |
| **Gross Contribution Margin (gross contribution as % of GMV)** | 10.7% | 8.3% |
| **EBITDA (in TRY)** | 71.1 million | (189 million) |
| **EBITDA as % or GMV** | 1.7% | (3.2%) |

76.     During the Company's conference call held on August 26, 2021, consistent with statements in the August 26 press release, Defendant Öz further explained that the decline in EBITDA as a percent of GMV "corresponds to a total 4.9 percentage-point decline in Q2 2021" compared to Q2 2020, "which is driven by 2.4 percentage-point decrease in gross contribution margin, 1.5 percentage-point rise in advertising expenses and approximately 1 percentage-point rise in other OpEx items. . . ."[18]  Moreover, the Company's press release also noted that operating expenses had increased by 22.2% "mainly due [to] the 97.9% increase in advertising expenses on digital and offline platforms" in Q2 2021.

77.     Ultimately, in response to an analyst question during the conference call regarding the Company's outlook for the second half of the year, Defendant Öz admitted that the trends had

---

[17]     Chart prepared from financial information provided in the August 26, 2021 Press Release.
[18]     Excerpts from the conference call held on August 26, 2021 come from the *Seeking Alpha* transcript of the call.

been "observed" starting in Q2.  Specifically, Defendant Öz stated "***the recent trends observed –
we observed in Q2*** and early Q3 are reflected on the outlook. . . ."  [Emphasis added.]

      **B.**     **Disclosure of Pre-IPO Strategic Margin Investment and Discounts**

78.    With respect to the material decline in gross contribution margin, the Company also
stated that the 2.4% drop was due to the strategic margin investments and customer discounts,
among other things.  Specifically,  the press release stated that "gross contribution margin (as a %
of GMV) declined 2.4pp to 8.3% compared to the second quarter of last year, ***mainly due to the
underlying dynamics in revenue growth***" and that the "2.4pp decline in gross contribution margin
is driven by strategic margin investment, the shift in electronics GMV to 3P, and the discounts
given to our customers for temporary marketing campaigns offset by other revenue streams."
[Emphasis added.]

79.    With respect to EBITDA, the Company stated that EBITDA was "negative TRY
188.6 million in Q2 2021 compared to positive TRY 71.1 million in Q2 2020" and that the
EBITDA decline was "due to lower gross contribution driven primarily by investments to fortify
our position in electronics, investments to penetrate in high frequency categories as well as
higher   customer demand for low margin products."  The press release also states that "***[a] 1.5
percentage points (pp) rise in our advertising expense as a percentage of GMV compared to Q2
2020 to invest in growth acceleration*** also impacted this performance."  [Emphasis added.]

      **C.**     **Disclosure of Pre-IPO Shift to Low Margin Products**

80.    Further, the August 26 press release indicates that the strategic margin investments
and discounts to customers were made in order to widen the selection and increase order frequency
in certain low margin categories and that, in fact, the Company had observed higher demand for
low margin products in Q2 2021 ***before the IPO***:

        "We continued to widen our selection with expanding merchant base and

23

competitive prices in the market by our strategic margin investments as well as discounts given to our customers for temporary marketing campaigns. Accordingly, we invested in certain non-electronic categories such as supermarket to drive order frequency and also invested in electronics categories to fortify our market position.

Additionally, *we observed higher customer demand for lower margin products across different categories* (such as digital products, gadgets and appliances including accessories, Bluetooth devices and robot vacuum cleaners)." [Emphasis added.]

81.     During a related conference call, Defendant Öz elaborated as follows in response to an analyst wanting "to understand better dimension of discounts":

"[O]ur gross contribution margin declined by 2.4 percentage points to 8.3% compared to the second quarter of last year, mainly due to underlying dynamics in revenue growth. *This 2.4 PP decline in gross contribution margin is driven by, as you said, strategic margin investments in certain categories*, like electronics, to fortify our market position, and in non-electronics, to drive further frequency by our customers, and also into CRM which we called as temporary margin investments, and this will be gradually reduced throughout the time. And also shift in electronics GMV into 3P, meaning marketplace. We sold more electronics from the marketplace units and therefore this affected our gross contribution. *And finally, the discounts given to our customers to widen –sorry, to continue, widen our selection with expanding merchant base and competitive prices in the markets by our strategic margin investments as well as discounts, given to our customers for temporary marketing campaigns.*

In terms of lower margin products, those lower margin products are mainly gadgets, appliances, Bluetooth devices and robot vacuum cleaners, and also 1P electronic products shift into the GMV. Mostly those products consist of appliances, mobile devices and technology devices, which has lower margin compared to non-electronics.

Well, depending on the market evolution, we expect this trend may continue in the third quarter as well, but we have always been prioritizing our growth to create long-term value. . ." [Emphasis added.]

82.     During the August 26, 2021 conference call, Defendant Öz also stated as follows, repeating much of what was disclosed in the press release and also admitting that the strategic margin investments were investments made to gain additional GMV at the expense of margins:

"On the margin investment and the take rate effect, I can say our gross

contribution margin declined by 2.4 percentage points, reaching 8.3% compared to the second quarter of last year. ***And this is mainly due to dynamics in revenue growth.*** There is a 2.5 percentage-point decline in gross contribution margin driven by strategic margin investment and because of CRM, which is we called as temporary margin investment. And those strategic margin investments are done in electronics to fortify our market position and in non-electronic to derive [sic] frequency for this -- to bring additional GMV for our company.

We continue to widen our selection with expanding merchant space and competitive prices in the market by our strategic margin investment as well as discounts given to our customers for temporary campaigns.

And accordingly, the investment in certain categories, non-electronic and electronic categories, such as supermarkets and some electronic categories, please note that we are very strong in electronics. And in electronics, there is biggest opportunity comes from offline. And in order to capture these offline customers, ***we have been making on and off basis, margin investments to gain additional GMV.***" [Emphasis added.]

83.     Then, on November 12, 2021, the Company issued a press release admitting that its soon to be released third quarter results "were unfavorably impacted by a combination of factors, mainly the slowdown in market growth rate and intensified competition."

84.     On November 23, 2021, the Company issued a press release revealing the continuation of the negative trends that had been observed in Q2 2021 before the IPO.  Revenue growth in Q3 2021 was negative 0.8% compared to the meager 5% growth in Q2 2021, gross contribution margins fell to 4.3% from 8.3% reported for Q2 2021 and the Company reported substantially lower EBITDA of negative TRY 698.8 million in Q3 2021 compared to EBITDA of positive TRY 8.9 million in Q3 2020 and EBITDA of negative TRY 189 million in Q2 2021.

## VI.     CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Hepsiburada ADSs issued in connection with the Company's IPO. Excluded from the Class are Defendants, the officers and directors of the Company, at all

relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

86.     The members of the Class are so numerous that joinder of all members is impracticable. Defendants caused the sale of approximately 65,251,000 Company ADSs in the IPO. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Hepsiburada or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

87.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

88.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

89.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statement and statements made by Defendants to the investing public omitted and/or misrepresented material facts about the business, operations, and prospects of Hepsiburada; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

90.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**FIRST CLAIM**

**Violation of Section 11 of the Securities Act**
**(Against All Defendants)**

91.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

92.     Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the IPO pursuant to the Registration Statement, which contained untrue statements of material fact, or omitted to disclose material facts.  This Count is based solely in strict liability as against Hepsiburada, and is based in negligence against all other Defendants.

93.     This Cause of Action does not sound in fraud.  Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

94.     This Count is brought by Plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against the Defendants named in this Count on behalf of itself and members of the Class who purchased Hepsiburada ADSs pursuant and/or traceable to the Registration Statement issued in connection with the IPO and were damaged by the acts alleged herein.

95.     Defendant Hepsiburada was the issuer, within the meaning of Section 11 of the

Securities Act and pursuant to the Registration Statement, of the registered securities sold in the IPO.

96.     As alleged above, Hepsiburada issued and sold ADSs to the Underwriter Defendants in the IPO.

97.     The Individual Defendants and Cogency signed the Registration Statement within the meaning of Section 11 of the Securities Act.

98.     The Underwriter Defendants acted as the underwriters for the IPO within the meaning of Section 11 of the Securities Act by selling and distributing the Hepsiburada ADSs offered to the investing public and purchased by Plaintiff and members of the Class, and solicited investors through the Registration Statement.

99.     The ADSs described in this Count were issued and sold pursuant to the Registration Statement.

100.     All purchases of the registered securities after IPO are traceable to the Registration Statement.

101.     As alleged above, the Registration Statement contained untrue statements of material fact.

102.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, as set forth above.

103.     In connection with offering the registered securities to the public and the sale of those securities, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

104.     As the issuer of the registered securities, Hepsiburada is strictly liable for the untrue

statements of material fact described herein.

105.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Registration Statement, contained untrue statements of material fact or failed to disclose material facts when they purchased or acquired Hepsiburada ADSs pursuant and/or traceable to the IPO.

106.    As a direct and proximate result of the acts and omissions of Defendants in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of Hepsiburada ADSs sold through in the IPO.

107.    By reason of the foregoing, Defendants are liable under Section 11 of the Securities Act to the members of the Class who purchased or otherwise acquired Hepsiburada ADSs sold pursuant and/or traceable to the Registration Statement.

108.    This claim is brought within one year of the discovery of the untrue statements in the Registration Statement, and within three years after the issuance of the Registration Statement.

## SECOND CLAIM

### Violation of Section 12(a)(2) of the Securities Act
### (Against Hepsiburada, Emirdağ, Öz, TurkCommerce and the Underwriter Defendants)

109.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

110.    This Cause of Action is brought pursuant to Section 12(a)(2) of the 1933 Act, 15 U.S.C. §771(a)(2), on behalf of the Class, against Hepsiburada, Emirdağ, Öz, TurkCommerce and the Underwriter Defendants.

111.    This Cause of Action does not sound in fraud.  Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

112.     Defendants named in this Count promoted, offered and sold Hepsiburada ADSs to Plaintiff and other members of the Class for Defendants' benefit and the benefit of their associates by means of the Prospectus which, as alleged above, included untrue statements of  material facts or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.   Furthermore, the Underwriter Defendants solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase shares in the IPO.

113.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff purchased Hepsiburada ADSs in the IPO directly from Defendant Morgan Stanley.

114.     Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

115.     By reason of the conduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act.

116.     As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Hepsiburada ADSs pursuant to the Prospectus sustained substantial damages in connection with their purchases of Hepsiburada ADSs.

117.     Accordingly, Plaintiff and the other members of the Class who purchased Hepsiburada ADSs issued pursuant to the Prospectus, seek damages to the extent permitted by law or seek to rescind and recover the consideration paid for their shares, and hereby tender their ADSs to the Defendants named in this Count.

118.     This claim is brought within one year of the discovery of the untrue statements in

the Registration Statement, and within three years after the issuance of the Registration Statement.

**THIRD CLAIM**

**Violation of Section 15 of the Securities Act**
**(Against the Individual Defendants)**

119.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

120.    This Count is brought by Plaintiff pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o,  against the Individual Defendants on behalf of itself and members of the Class who purchased Hepsiburada ADSs pursuant and/or traceable to the Registration Statement issued in connection with the IPO and were damaged by the acts alleged herein.

121.    As set forth in Counts I and II, Hepsiburada is strictly liable under Sections 11 and 12(a)(2) of the Securities Act for untrue statements of material fact in the Registration Statement.

122.    This Cause of Action does not sound in fraud.  Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

123.    At all relevant times, the Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Hepsiburada within the meaning of Section 15 of the Securities Act. The Individual Defendants  had the power and influence and exercised the same to cause Hepsiburada to engage in the acts  described herein, including by causing Hepsiburada to close the IPO, and exercised such power.

124.    By virtue of their positions as senior officers, or members of Hepsiburada's board of directors, or their status as signatories of the Registration Statement, each of the Individual Defendants had the power to control, and did control, Hepsiburada in closing the IPO, including controlling the contents of the Registration Statement, which contained materially false statements.

31

125.    By reason of the aforementioned conduct and by virtue of their positions as controlling persons of Hepsiburada, each of the Individual Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as Hepsiburada is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired Hepsiburada ADSs pursuant and /or traceable to the Registration Statement.

126.    As a direct and proximate result of the conduct of the Individual Defendants, members of the Class suffered damages in connection with their purchase or acquisition of Hepsiburada ADSs.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)    Awarding rescission or a rescissionary measure of damages; and

(e)    Awarding disgorgement, or such other equitable, injunctive or other relief as deemed appropriate by the Court.

## VIII.    **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  February 4, 2022                          Respectfully submitted,

                                                                  */s/ Frederic S. Fox*
_____

Frederic S. Fox
Donald R. Hall
Jeffrey P. Campisi
Pamela A. Mayer
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
ffox@kaplanfox.com
dhall@kaplanfox.com
jcampisi@kaplanfox.com
pmayer@kaplanfox.com

*Attorneys for Lead Plaintiff IWA-Forest*
*Industry Pension Plan and the Proposed*
*Class*

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Derrick Johnstone, hereby certify as follows:

1.     I am Chief Executive Officer of IWA Forest Industry Pension Plan ("IWA") and am authorized to make a certification on behalf of IWA.

2.     I have reviewed a complaint for the securities class action pending against D-MARKET Elektronik Hizmetler ve Ticaret Anonim Sirketi ("D-MARKET Elektronik") and certain executives alleging violations of the securities laws, and IWA is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

3.     IWA did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.     IWA is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial if necessary. IWA fully understands the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act of 1995, specifically concerning its selection and retention of counsel and overseeing and directing the prosecution of the action on behalf of the class.

5.     IWA's transactions in D-MARKET Elektronik American Depositary Receipts ("ADRs") during the proposed class period are set forth in Schedule A, which is attached hereto.

6.     IWA sought to serve or serves as a representative party or lead plaintiff on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

- *Plaut v. The Goldman Sachs Group, Inc., et al.*, No. 1:18-cv-12084 (S.D.N.Y.); and
- *In re Textron, Inc. Sec. Litig.*, No. 1:19-cv-0788 (S.D.N.Y.).

7.     IWA will not accept any payment for serving as a representative party on behalf of a class beyond its pro-rata share of any recovery, except as ordered or approved by the court, including any award to a representative plaintiff of reasonable costs and expenses directly related to the representation of the class.

8.     I declare under penalty of perjury that the foregoing is true and correct, executed on this ___7th___ day of December, 2021.

Derrick Johnstone
*Chief Executive Officer*
*IWA Forest Industry Pension Plan*

**Schedule A**
**IWA's Transactions in D-MARKET Elektronik ADRs**

| Security Name | CUSIP | Transaction | Trade Date | Quantity | Price |
|---|---|---|---|---|---|
| ADR D-MARKET ELECTR SVCS & TRADING | 23292B104 | Purchases | 7/1/2021 | 38,730 | $12.00 |
| ADR D-MARKET ELECTR SVCS & TRADING | 23292B104 | Purchases | 7/1/2021 | 6,800 | $12.98 |
| ADR D-MARKET ELECTR SVCS & TRADING | 23292B104 | Purchases | 7/1/2021 | 400 | $13.00 |
| ADR D-MARKET ELECTR SVCS & TRADING | 23292B104 | Purchases | 7/13/2021 | 1,900 | $13.00 |
| ADR D-MARKET ELECTR SVCS & TRADING | 23292B104 | Purchases | 7/14/2021 | 10,400 | $12.97 |
| ADR D-MARKET ELECTR SVCS & TRADING | 23292B104 | Purchases | 7/15/2021 | 4,100 | $12.99 |
| ADR D-MARKET ELECTR SVCS & TRADING | 23292B104 | Purchases | 7/16/2021 | 5,600 | $12.95 |
| ADR D-MARKET ELECTR SVCS & TRADING | 23292B104 | Purchases | 7/19/2021 | 7,400 | $12.99 |
| ADR D-MARKET ELECTR SVCS & TRADING | 23292B104 | Purchases | 7/20/2021 | 2,200 | $13.01 |