# EXHIBIT 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

——————————————————————— X
                                  :

|  |  |
|---|---|
| JAMES BENSON, Individually and on Behalf of All Others Similarly Situated, | Index No. |
| Plaintiff, | CLASS ACTION |
| vs. | |
| D-MARKET ELEKTRONIK HIZMETLER VE TICARET ANONIM ŞIRKETI, HANZADE VASFIYE DOĞAN BOYNER, MEHMET MURAT EMIRDAĞ, HALIL KORHAN ÖZ, ERMAN KALKANDELEN, MEHMET EROL ÇAMUR, CEMAL AHMET BOZER, VUSLAT DOĞAN SABANCI, MUSTAFA AYDEMIR, TOLGA BABALIARE, COLLEEN A. DE VRIES, TURKCOMMERCE B.V., MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, GOLDMAN, SACHS & CO. LLC, BOFA SECURITIES, INC. and UBS SECURITIES LLC, | **SUMMONS** |
| Defendants. | |

——————————————————————— X

To the below named Defendants:

        D-MARKET ELEKTRONIK HIZMETLER VE TICARET ANONIM ŞIRKETI
        Registered Agent: Cogency Global, Inc.
        122 East 42nd Street, 18th Floor
        New York, NY 10168

        HANZADE VASFIYE DOĞAN BOYNER
        c/o D-Market Elektronik Hizmetler ve Ticaret Anonim Sirketi
        Registered Agent: Cogency Global, Inc.
        122 East 42nd Street, 18th Floor
        New York, NY 10168

Case 1:21-cv-08634-PKC   Document 49-10   Filed 04/15/22   Page 3 of 25

MEHMET MURAT EMIRDAĞ
c/o D-Market Elektronik Hizmetler ve Ticaret Anonim Sirketi
Registered Agent: Cogency Global, Inc.
122 East 42nd Street, 18th Floor
New York, NY 10168

HALIL KORHAN ÖZ
c/o D-Market Elektronik Hizmetler ve Ticaret Anonim Sirketi
Registered Agent: Cogency Global, Inc.
122 East 42nd Street, 18th Floor
New York, NY 10168

ERMAN KALKANDELEN
c/o D-Market Elektronik Hizmetler ve Ticaret Anonim Sirketi
Registered Agent: Cogency Global, Inc.
122 East 42nd Street, 18th Floor
New York, NY 10168

MEHMET EROL ÇAMUR
c/o D-Market Elektronik Hizmetler ve Ticaret Anonim Sirketi
Registered Agent: Cogency Global, Inc.
122 East 42nd Street, 18th Floor
New York, NY 10168

CEMAL AHMET BOZER
c/o D-Market Elektronik Hizmetler ve Ticaret Anonim Sirketi
Registered Agent: Cogency Global, Inc.
122 East 42nd Street, 18th Floor
New York, NY 10168

VUSLAT DOĞAN SABANCI
c/o D-Market Elektronik Hizmetler ve Ticaret Anonim Sirketi
Registered Agent: Cogency Global, Inc.
122 East 42nd Street, 18th Floor
New York, NY 10168

MUSTAFA AYDEMIR
c/o D-Market Elektronik Hizmetler ve Ticaret Anonim Sirketi
Registered Agent: Cogency Global, Inc.
122 East 42nd Street, 18th Floor
New York, NY 10168

- 2 -

Case 1:21-cv-08634-PKC    Document 49-10    Filed 04/15/22    Page 4 of 25

TOLGA BABALIARE
c/o D-Market Elektronik Hizmetler ve Ticaret Anonim Sirketi
Registered Agent: Cogency Global, Inc.
122 East 42nd Street, 18th Floor
New York, NY 10168

COLLEEN A. DE VRIES
217 Summit Road
Mahwah, NJ 07430

TURKCOMMERCE B.V.
Amstelveenseweg 760
1081JK Amsterdam
The Netherlands

MORGAN STANLEY & CO. LLC
Registered Agent:
CT Corporation System
330 North Brand Boulevard
Glendale, CA 91203

J.P. MORGAN SECURITIES LLC
Registered Agent:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

GOLDMAN, SACHS & CO. LLC
Registered Agent:
CT Corporation System
818 West Seventh Street, Suite 930
Los Angeles, CA 90017

BOFA SECURITIES, INC.
Registered Agent:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

UBS SECURITIES LLC
Registered Agent:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

- 3 -

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis for venue is that certain of the parties reside in this County, the parties transact business in this County, and/or transactions underlying the Complaint took place in part in this County.

DATED: September 28, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY

_____
      */s/ Samuel H. Rudman*
      SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

JOHNSON FISTEL, LLP
RALPH M. STONE
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: 212/292-5690
212/292-5680 (fax)
ralphs@johnsonfistel.com

*Attorneys for Plaintiff*

- 4 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————————— X
                                        :
JAMES BENSON, Individually and on Behalf :   Index No.
of All Others Similarly Situated,        :
                                        :
                    Plaintiff,           :
                                        :
            vs.                          :   CLASS ACTION
                                        :
D-MARKET ELEKTRONIK HIZMETLER            :   COMPLAINT FOR VIOLATIONS OF THE
VE TICARET ANONIM ŞIRKETI,               :   FEDERAL SECURITIES LAWS
HANZADE VASFIYE DOĞAN BOYNER,            :
MEHMET MURAT EMIRDAĞ, HALIL              :
KORHAN ÖZ, ERMAN KALKANDELEN,            :
MEHMET EROL ÇAMUR, CEMAL AHMET           :
BOZER, VUSLAT DOĞAN SABANCI,             :
MUSTAFA AYDEMIR, TOLGA                   :
BABALIARE, COLLEEN A. DE VRIES,          :
TURKCOMMERCE B.V., MORGAN                :
STANLEY & CO. LLC, J.P. MORGAN           :
SECURITIES LLC, GOLDMAN, SACHS &         :
CO. LLC, BOFA SECURITIES, INC. and       :   DEMAND FOR JURY TRIAL
UBS SECURITIES LLC                       :
                                        :
                    Defendants.          :
————————————————————————— X

Plaintiff, James Benson, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of D-MARKET Elektronik Hizmetler ve Ticaret Anonim Şirketi ("D-Market" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other publicly disclosed reports and information about defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of D-Market ADRs pursuant or traceable to D-Market's July 1, 2021 initial public stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act").[1]

2.      D-Market is an online e-commerce company in Turkey where it is colloquially known as the "Amazon of Turkey." Like other online retailers, D-Market benefitted substantially from lockdown orders during the COVID-19 pandemic which increased demand for at-home shopping.

3.      On July 1, 2021, following the conclusion of D-Market's second quarter 2021 ("2Q21"), Defendants conducted the IPO, selling 62.251 million D-Market ADRs at $12 per ADR and reaping more than $783 million in gross offering proceeds. This included $283 million in proceeds received by the Selling Stockholder Defendant (defined below). The registration

---

[1]    Each ADR represents one Class B share of D-Market common stock, which shares are held by the ADR depository here in New York.

statement and prospectus for the IPO (collectively, the "Registration Statement") were materially false and misleading and failed to comply with SEC rules and regulations governing the preparation of such documents.

4.    Specifically, the Registration Statement failed to disclose that D-Market had suffered deeply disappointing financial results in 2Q21 – ***before the IPO*** – and instead represented that the Company was experiencing tremendous revenue and sales growth at the time of the offering.   In fact, the growth trends highlighted in the Registration Statement had dramatically decelerated in the lead up to the IPO as Turkey reopened following previously imposed COVID-19 related shutdowns.  For example, the Registration Statement stated that D-Market's "business ha[d] experienced a long history of strong growth as a result of [its] commitment to meticulous execution"  and highlighted D-Market's "66%" revenue increase "to TRY 1.4 billion in the three months ended March 31, 2021" and "145%" revenue increase "to TRY 6.4 billion in 2020."   Similarly, the Registration Statement stated that D-Market had achieved gross merchandise volume ("GMV") growth of 95% and 111% in 1Q21 and fiscal 2020, respectively.  The Registration Statement further stated that these impressive results were being "***fueled by increasing purchase frequency, greater customer loyalty and an expanding pool of Active Customers*** of 9 million in 2020, up from 6.5 million in 2019 and 4.8 million in 2018, with a compound annual growth rate ("CAGR") of 38% from 2018 to 2020."

5.    In truth and in fact, however, during D-Market's already completed 2Q21, the Company generated revenue of just 1.75 billion TRY, a mere increase of just 5% year-over-year. Likewise, D-Market's 2Q21 GMV was only 5.9 billion TRY, a paltry increase of just 38% year over year – less than half the 95% GMV growth reported in the 1Q21.  As D-Market's August 26, 2021 press release announcing its 2Q21 financial results would concede, "[a]s the second

- 2 -

half of the year began, the Turkish e-commerce market has encountered several challenges," with "[t]hese includ[ing] the nationwide extension of the bank holiday period during the celebration of Eid al-Adha in July, *and the lift-off of lock-down measures as of July 1st, both of which adversely impacted consumer behavior in online shopping*." D-Market also admitted that it expected "these adverse circumstances [to continue to] impact the market" and that it had experienced essentially no active customer growth for the quarter.

6. In a highly unusual move so close to an initial public offering, D-Market also announced that day a sizable executive leadership shakeup. Effective September 1, 2021, Murat Buyumez, D-Market's Chief Strategy ("CSO") and Chief Business Officer ("CBO"), would assume the role of Chief Commercial Officer ("CCO") in charge of category management and commercial operations, and Mutlu Erturan, D-Market's then-current CCO, would become the Company's CBO, heading up new ventures, growth initiatives, and strategic opportunities. The role of CSO would remain vacant indefinitely.

7. Subsequent to the IPO, the price of D-Market ADRs have traded as low as $6.35 each, a nearly *50% decline* from the price at which D-Market ADRs were sold to investors in the IPO less than three months previously.

## JURISDICTION AND VENUE

8. The claims alleged herein arise under Sections 11 and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o. Jurisdiction is conferred upon this Court by Section 22 of the 1933 Act and the action is not removable to federal court.

9. Personal jurisdiction and venue are proper pursuant to Section 22 of the 1933 Act. The violations of law complained of herein occurred in large part in this State and in large part this County, including the preparation and dissemination of the materially false and misleading Registration Statement. Defendant D-Market irrevocably submitted to the jurisdiction of this

- 3 -

Court in a provision of its ADR agreement, which was filed as an attachment to the IPO

Registration Statement.[2]  In addition, Defendant D-Market, the Selling Stockholder Defendant

and the Underwriting Defendants (defined below) all irrevocably submitted to the jurisdiction of

this Court in the Underwriting Agreement, which was filed as an attachment to the Registration

Statement.[3]  Because the Underwriter Defendants were the counterparties to the Underwriting

---

[2]    **SECTION 7.6. Appointment of Agent for Service of Process; Submission to Jurisdiction; Jury Trial Waiver.**

The Company hereby (i) designates and appoints the person named in Exhibit A to this Deposit Agreement as the Company's authorized agent in the United States upon which process may be served in any suit or proceeding arising out of or relating to the Shares or Deposited Securities, the American Depositary Shares, the Receipts or this Deposit Agreement (a "Proceeding"), (ii) *consents and submits to the jurisdiction of the* United States District Court for the Southern District of New York or *the Supreme Court of the State of New York, New York Country, in which any Proceeding may be instituted and the respective courts having jurisdiction to hear appeals from those courts* and (iii) agrees that service of process upon said authorized agent shall be deemed in every respect effective service of process upon the Company in any Proceeding. The Company agrees to deliver to the Depositary, upon the execution and delivery of this Deposit Agreement, a written acceptance by the agent named in Exhibit A to this Deposit Agreement of its appointment as process agent. The Company further agrees to take any and all action, including the filing of any and all such documents and instruments, as may be necessary to continue that designation and appointment in full force and effect, or to appoint and maintain the appointment of another process agent located in the United States as required above, and to deliver to the Depositary a written acceptance by that agent of that appointment, for so long as any American Depositary Shares or Receipts remain outstanding or this Deposit Agreement remains in force. In the event the Company fails to maintain the designation and appointment of a process agent in the United States in full force and effect, *the Company hereby waives personal service of process upon it and consents that a service of process in connection with a Proceeding may be made* by certified or registered mail, return receipt requested, directed to the Company at its address last specified for notices under this Deposit Agreement, and service so made shall be deemed completed five (5) days after the same shall have been so mailed.

[3]    **Submission to Jurisdiction. *Each of the Company and the Selling Stockholder hereby submit to the exclusive jurisdiction of the* U.S. federal and *New York state courts in the Borough of Manhattan in The City of New York in any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. Each of the Company and the Selling Stockholder waive any objection which it may now or hereafter have to the laying of venue of any such suit or proceeding in such courts.* Each of the Company and the Selling Stockholder agrees that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding upon the Company and the Selling Stockholder, as applicable, and may be enforced in any court to the jurisdiction of which Company and the

- 4 -

Agreement and each of the Individual Defendants (defined below) authorized the execution of

the Underwriting Agreement by D-Market and took numerous acts in furtherance of completing

the IPO, each of these defendants also submitted to the jurisdiction of this Court by directing

these acts within the State of New York. Furthermore, Lead Book-Running Underwriter

Defendants Morgan Stanley, JP Morgan and Goldman Sachs (defined below), served as the lead

underwriters of the underwriters of the IPO and as representatives of the other Underwriter

Defendants, and conducted the IPO in large part from their Manhattan Offices. Each of the other

Underwriter Defendants has a sizable New York County practice and each maintains substantial

---

Selling Stockholder, as applicable, is subject by a suit upon such judgment. Each of the Company and the Selling Stockholder irrevocably appointed Cogency Global Inc., located at 122 East 42nd Street, 18th Floor, New York, New York 10168, United States, as its authorized agent in the Borough of Manhattan in The City of New York upon which process may be served in any such suit or proceeding, and agrees that service of process upon such authorized agent, and written notice of such service to the Company or any such Selling Stockholder, as the case may be, by the person serving the same to the address provided in this Section 18(c), shall be deemed in every respect effective service of process upon the Company and such Selling Stockholder in any such suit or proceeding. Each of the Company and the Selling Stockholder hereby represent and warrant that such authorized agent has accepted such appointment and has agreed to act as such authorized agent for service of process. Each of the Company and the Selling Stockholder further agree to take any and all action as may be necessary to maintain such designation and appointment of such authorized agent in full force and effect for a period of six years from the date of this Agreement.

*       *       *

**(zz)        Valid Choice of Law**. The choice of laws of the State of New York as the governing law of the Transaction Documents is a valid choice of law under the laws of Turkey and will be honored by the courts of Turkey, subject to the restrictions described under the caption "Enforceability of Civil Liabilities" in the Registration Statement, the Pricing Disclosure Package and the Prospectus. ***The Company (i) has the power to submit, and pursuant to Section 18(c) of this Agreement, has legally, validly, effectively and irrevocably submitted, to the personal jurisdiction of each New York state*** and United States federal court ***sitting in the City of New York and has validly and irrevocably waived any objection to the laying of venue of any suit, action or proceeding brought in such court***; and (ii) has the power to designate, appoint and empower, and pursuant to Section 18(c), has legally, validly and effectively designated, appointed and empowered an agent for service of process in any suit or proceeding based on or arising under the Transaction Documents in any of the U.S. federal and New York state courts in the Borough of Manhattan in The City of New York.

- 5 -

and continuous contact with New York County by conducting significant investment banking operations in this County and throughout this State. Much, if not all, of the road shows conducted by the Underwriter Defendants, D-Market and the Executive Defendants (defined below), used to market the IPO, were conducted in or from New York City. The Bank of New York Mellon here in New York City serves as the depositary of D-Market's ADR program. Defendant D-Market's agent for process of service in the U.S. is Cogency Global Inc., 122 East 42nd Street, 18th Floor, New York, NY.

## PARTIES

10. Plaintiff, James Benson, purchased D-Market ADRs pursuant to the IPO, and was damaged thereby.

11. Defendant D-Market, based in Istanbul, Turkey, operates as an online e-commerce company. D-Market is a dual stock company with Class A and Class B ordinary shares. The Class B shares are entitled to one vote per share whereas the Class A shares are entitled to 15 votes per share. Each ADR sold in the IPO represents one Class B ordinary shares which are being held by the ADR depository here in New York City. Since the IPO, the ADRs of D-Market have traded on the NASDAQ under the ticker symbol "HEPS."

12. Defendant Hanzade Vasfiye Doğan Boyner ("Boyner") founded D-Market and has served as the Chairwoman of its Board of Directors (the "Board") at all relevant times. Defendant Boyner beneficially owns all of the Company's Class A common stock and following the completion of the IPO owns 10.4% of D-Market's Class B ordinary shares, representing 71.1% of the voting power of all of D-Market Class A shares and Class B ordinary shares voting together as a single class. As a result, defendants admit in the IPO Registration Statement that D-Market is "a 'controlled company' under the Nasdaq listing rules."

- 6 -

13. Defendant Mehmet Murat Emirdağ ("Emirdağ") has served as the Chief Executive Officer ("CEO") of D-Market and a member of its Board at all relevant times.

14. Defendant Halil Korhan Öz ("Öz") has served as the Chief Financial Officer ("CFO") of D-Market and a member of its Board at all relevant times.

15. Defendants Erman Kalkandelen ("Kalkandelen"), Mehmet Erol Çamur, Cemal Ahmet Bozer, Vuslat Doğan Sabanci, Mustafa Aydemir and Tolga Babalıare have served as members of the D-Market Board at all relevant times, with Defendant Kalkandelen also serving as the Board's Vice Chairwoman.

16. Defendant Colleen A. De Vries ("De Vries") is, and was at the time of the IPO D-Market's "Authorized U.S. Representative" for purposes of the IPO and signed the Registration Statement in that capacity.

17. The defendants identified above at ¶¶12-16 signed the IPO Registration Statement and are sometimes referred to collectively herein as the "Individual Defendants." Defendants Boyner, Emirdağ and Öz were executives of D-Market at the time of the IPO, participated in the roadshow to sell the IPO and are also sometimes referred to herein as the "Executive Defendants."

18. Defendant TurkCommerce B.V. (the "Selling Stockholder Defendant") is an investment vehicle incorporated under the laws of the Netherlands. TurkCommerce B.V. is beneficially owned and controlled by Templeton Turkey Fund GP Ltd. and is managed pursuant to a limited partnership agreement among Templeton Turkey Fund GP Ltd., Templeton Turkey Fund, L.P. and Templeton Asset Management Ltd. Defendants Kalkandelen and Aydemir are both directors of TurkCommerce B.V. and signed the Registration Statement at the direction of the Selling Stockholder Defendant.

19. Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), J.P. Morgan Securities LLC ("JP Morgan"), Goldman, Sachs & Co. LLC ("Goldman Sachs"), BofA Securities, Inc. and UBS Securities LLC are investment banking firms that acted as underwriters and managers of the IPO, helping to draft and disseminate the IPO documents, with defendants Goldman Sachs and Morgan Stanley serving as representatives of the other underwriters in the IPO. These defendants are referred to herein as the "Underwriter Defendants." Pursuant to the 1933 Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared more than $37.35 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize D-Market stock in the IPO.

(b) The Underwriter Defendants also demanded and obtained an agreement from D-Market that D-Market would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that D-Market had purchased millions of dollars in directors' and officers' liability insurance.

(c) Representatives of the Underwriter Defendants also assisted D-Market and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of D-Market, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the

- 8 -

Underwriter Defendants had continual access to confidential corporate information concerning D-Market' operations and financial prospects.

(d)    In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of these same Underwriter Defendants met with D-Market's management, top executives and outside counsel and engaged in "drafting sessions" between at least March 2021 and July 2021. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which D-Market stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about D-Market would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and management and top executives, the Underwriter Defendants knew, or should have known, of D-Market' existing problems as detailed herein.

(e)    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

## BACKGROUND

20.    Defendant D-Market, which also refers to itself as "Hepsiburada," is the leading e-commerce provider in Turkey and is colloquially known as the "Amazon of Turkey." It was founded in 2000 and is the first Turkish company publicly listed on the NASDAQ. As the second most populous country in Europe with a population of 84 million as of December 31, 2020, Turkey presents a potentially attractive growth market for the Company's e-commerce platform.

- 9 -

Case 1:21-cv-08634-PKC     Document 49-10     Filed 04/15/22     Page 16 of 25

21.     In 2020, D-Market expanded its commerce platform, developing a wide ecosystem of services marketed to its customers.  That ecosystem now includes HepsiExpress, HepsiPay, HepsiJet, HepsiLojistik, HepsiMat, HepsiAd, HepsiGlobal and HepsiFly.  For example, HepsiExpress provides grocery delivery services.  HepsiGlobalh allows Turkish-based customers to purchase products listed by merchants around the world.  In 2021, D-Market launched water and flower delivery services and has stated its intention to expand into providing tourism-related services.

22.     As the global COVID-19 pandemic raged across the globe and consumers increasingly shifted to online retailers, D-Market experienced significant growth throughout fiscal 2020 and the 1Q21.  The first case of COVID-19 in Turkey was recorded on March 11, 2020 and the first death due to COVID-19 in the country occurred on March 15, 2020.  Starting March 16, 2020, the Turkish Ministry of National Education closed schools in Turkey and the Turkish Minister of the Interior ordered businesses and places of worship to halt indoor activities.  With that announcement, more than 80 million people in Turkey started to live under some form of restrictions and trains and public transit came to a halt nationwide.  Then, on March 21, 2020, the Turkish Minister of the Interior announced a total curfew for those aged 65 or older and persons whose immune system were compromised due to "chronic pulmonary diseases, asthma, COPD, cardiovascular disease, kidney disease, hypertension, and liver disease."  On April 3, 2020, citing the potential for asymptomatic transmission of COVID-19 by children, the Turkish Ministry of Health extended the curfew to people 20 years of age and younger.  In a televised address on the same day, President Erdoğan announced measures prohibiting entries into and exit from Turkey's largest cities, including the commercial hub Istanbul for 15 days.

- 10 -

23.     After easing certain lockdown measures in late summer 2020, in November 2020 the Turkish Ministry of Health reinstated the curfew for people aged 65 and older and people aged 20 and younger as COVID-19 cases again began to increase. The Turkish Minister of Internal Affairs also ordered businesses and places of worship to again halt indoor activities. Then, beginning March 2021, the Turkish government began to ease all COVID-19 restrictions.

24.     On or about March 19, 2021, as Turkey was beginning to reopen its economy, D-Market filed with the SEC its registration statement on Form F-1 (Registration No. 333-256654), which would later be utilized for the IPO (the "Registration Statement"). The SEC declared the Registration Statement effective on June 30, 2021 and that same evening D-Market, the Selling Stockholder Defendant and the Underwriter Defendants priced the IPO and filed with the SEC the final prospectus for the IPO (the "Prospectus"), which formed part of the Registration Statement (the Prospectus and Registration Statement are collectively referred to herein as the "Registration Statement"). Defendants used the Registration Statement to offer and sell more than 62.251 million shares of D-Market ADRs to the investing public, including the underwriters' entire overallotment option, reaping more than $783 million in total gross proceeds.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT[4]

25.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

---

[4]     All emphasis in bold and italics added, unless otherwise noted.

- 11 -

Case 1:21-cv-08634-PKC    Document 49-10    Filed 04/15/22    Page 18 of 25

26.    Concerning D-Market's revenue and GMV growth trends, the Registration Statement stated that D-Market's "business ha[d] experienced a *long history of strong growth* as a result of [its] commitment to meticulous execution."  As a result of this purported "meticulous execution," the Registration Statement stated that D-Market's "revenues increased by 66% to TRY 1.4 billion in the three months ended March 31, 2021 from TRY 0.8 billion in the three months ended March 31, 2020 and by 145% to TRY 6.4 billion in 2020 from TRY 2.6 billion in 2019, and by 33% from TRY 2.0 billion in 2018."  Similarly, the Registration Statement stated that D-Market's "total GMV increased by 95% to TRY 4.5 billion in the three months ended March 31, 2021 from TRY 2.3 billion in the three months ended March 31, 2020, and by 111% to TRY 17.0 billion in 2020 from TRY 8.0 billion in 2019, which was an increase of 56% from TRY 5.1 billion in 2018."

27.    The Registration Statement stated that these strong results were being "*fueled by increasing purchase frequency, greater customer loyalty and an expanding pool of Active Customers* of 9 million in 2020, up from 6.5 million in 2019 and 4.8 million in 2018, with a compound annual growth rate [] of 38% from 2018 to 2020."  Similarly, the Registration Statement stated that the Company's "*growth has been fueled by several factors, including an increased frequency of orders* to 3.9 in 2020, up from 3.5 in 2019 and 3.1 in 2018, *and an expanding Active Customer base* of 9 million in 2020, up from 6.5 million in 2019 and 4.8 million in 2018."  The Registration Statement added, "[a]s we continue to scale up Hepsiburada, *we believe that these trends will continue to positively impact our business, with further Active Customer base growth, strong cohort performance and increasing operational efficiency driving improvement in unit economics and profitability*."

- 12 -

28. The statements referenced above in ¶¶26-27 were materially false and misleading because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a) That D-Market had suffered a sharp deceleration in operational and sales growth as consumers retreated from e-commerce offerings in 2Q21;

(b) That D-Market's revenue growth had decreased to just 5% year-over-year growth in 2Q21, over 90% below the most recent growth rate highlighted in the Registration Statement;

(c) That D-Market's GMV growth had decreased to just 38% year-over-year growth in 2Q21, less than half the most recent growth rate highlighted in the Registration Statement; and

(d) that as a result of the foregoing, at the time of the IPO, the Company's business and financial prospects were not as strong as represented in the IPO Registration Statement.

29. Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. At the time of the IPO, D-Market's 2Q21 revenue and GMV growth had already dramatically declined due to the reopening of the Turkish economy. The adverse events and uncertainties associated with these negative trends were known to Defendants and were reasonably likely to have a material impact on D-Market's profitability, and, therefore, were required to be disclosed in the Registration Statement, but they were not.

- 13 -

30.     Moreover, pursuant to Item 105 of Regulation S-K [17 C.F.R. § 229.105], issuers are required to disclose **the most significant factors** that make an investment in the registrant or offering **speculative or risky**. Item 105 expressly states that registrants must set forth each risk factor under a sub-caption that **adequately describes the risk**. Additionally, Item 105 directs registrants to explain how each risk affects the registrant or the securities being offered and discourages disclosure of risks that could apply to any registrant. Here the Registration Statement's purported risk warnings were wholly inadequate. For example, the Registration Statement failed to disclose that D-Market's revenue growth had **already** declined precipitously by the time of the IPO, and instead misleadingly stated that this "may" occur in the future as reflected in the following excerpt:

> COVID-19 and the measures taken to limit its spread have impacted consumer behavior, including e-commerce shopping trends. During the COVID-19 pandemic, increased numbers of consumers in the Turkish market have shifted to e-commerce as a result of social distancing and other government restrictions, which resulted in the growth for demand for our products and services. However, **customers may shift back** towards offline retailers as social distancing and government restrictions ease, as a result of which **we may experience** slower than expected growth. Moreover, as the full impact of the COVID-19 pandemic continues to evolve, **it is uncertain what effect the pandemic will have** on consumer behavior and the demand for various goods and services **may evolve**. For instance, e-commerce orders for groceries and other essential products have increased significantly during the pandemic, and **the risk that this trend reverses or otherwise alters in the future cannot be excluded.**

31.     Because the reopening of Turkey's economy had **already** dramatically negatively impacted the Company's revenue growth, this purported risk disclosure was itself materially false and misleading because it misrepresented this fact claiming instead that these adverse circumstances had not yet occurred.

32.     The IPO was successful for the Company, the Selling Stockholder Defendant and the Underwriters Defendants who sold more than 62.251 million ADRs representing more than 62.251 million Class A ordinary shares to the investing public, raising more than $783 million in

- 14 -

Case 1:21-cv-08634-PKC    Document 49-10    Filed 04/15/22    Page 21 of 25

gross proceeds ($709.66 million net of underwriting fees and IPO costs). This included 23.581 million ADRs sold by the Selling Stockholder Defendant, who generated nearly $283 million in gross proceeds (nearly $269 million net of underwriting fees and IPO costs).

33.    Following the IPO, the market price of D-Market ADRs has since plummeted. By September 2021, the price of D-Market ADRs have traded as low as $6.35, a *nearly 50%* decline from the price at which D-Market ADRs were sold to investors in the IPO less than three months previously.

## CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this action as a class action on behalf of all those who purchased D-Market ADRs pursuant to the Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are defendants and their families, the officers, directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

35.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by D-Market or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

- 15 -

Case 1:21-cv-08634-PKC    Document 49-10    Filed 04/15/22    Page 22 of 25

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the 1933 Act;

(b)     whether statements made by defendants to the investing public in the Registration Statement and Prospectus misrepresented material facts about the business and operations of D-Market; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

39.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### Violations of Section 11 of the 1933 Act Against All Defendants

40.     Plaintiff incorporates ¶¶1-39 by reference.

41.     This Cause of Action is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

- 16 -

Case 1:21-cv-08634-PKC    Document 49-10    Filed 04/15/22    Page 23 of 25

42.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

43.     D-Market is strictly liable to Plaintiff and the Class for the misstatements and omissions.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

44.     By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, Section 11 of the 1933 Act.

45.     Plaintiff acquired D-Market ADRs traceable to the IPO.

46.     Plaintiff and the Class have sustained damages.  The value of D-Market ADRs has declined substantially subsequent to and due to these defendants' violations.

47.     At the time of their purchases of D-Market ADRs, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

### SECOND CAUSE OF ACTION

**For Violation of Section 15 of the 1933 Act Against D-Market
and the Individual Defendants**

48.     Plaintiff incorporates ¶¶1-47 by reference.

- 17 -

Case 1:21-cv-08634-PKC   Document 49-10   Filed 04/15/22   Page 24 of 25

49.     This Cause of Action is brought pursuant to Section 15 of the 1933 Act against D-Market and the Individual Defendants.

50.     The Individual Defendants each were control persons of D-Market by virtue of their positions as directors and/or senior officers of D-Market.  Indeed, the Registration Statement expressly concedes that D-Market was a "controlled company" due to Defendant Boyner's ownership interest.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of D-Market.  D-Market controlled the Individual Defendants and all of its employees.

51.     D-Market and the Individual Defendants each were culpable participants in the violations of Sections 11 and 12(a)(2) of the 1933 Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiff as a Class representative under NY CPLR Ch. Eight, Art. 9, *et seq.*, and Plaintiff's counsel as Class counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

- 18 -

Case 1:21-cv-08634-PKC    Document 49-10    Filed 04/15/22    Page 25 of 25

D.    Awarding rescission or a rescissory measure of damages on the Section 12(a)(2)

claims; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: September 28, 2021

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

JOHNSON FISTEL, LLP
RALPH M. STONE
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: 212/292-5690
212/292-5680 (fax)
ralphs@johnsonfistel.com

*Attorneys for Plaintiff*

- 19 -