# EXHIBIT 13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

————————————————————————————— X

JAMES BENSON, Individually and on Behalf
of All Others Similarly Situated,

                                Plaintiff,

            vs.

D-MARKET ELEKTRONIK HIZMETLER
VE TICARET ANONIM ŞIRKETI,
HANZADE VASFIYE DOĞAN BOYNER,
MEHMET MURAT EMIRDAĞ, HALIL
KORHAN ÖZ, ERMAN KALKANDELEN,
MEHMET EROL ÇAMUR, CEMAL AHMET
BOZER, VUSLAT DOĞAN SABANCI,
MUSTAFA AYDEMIR, TOLGA BABALI,
TAYFUN BAYAZIT, COLLEEN A. DE
VRIES, COGENCY GLOBAL INC.,
TURKCOMMERCE B.V., MORGAN
STANLEY & CO. LLC, J.P. MORGAN
SECURITIES LLC, GOLDMAN, SACHS &
CO. LLC, BOFA SECURITIES, INC., and
UBS SECURITIES LLC,

                         Defendants.

————————————————————————————— X

: Index No. 655701/2021
:
: The Honorable Andrew Borrok, J.S.C.
:
: Part 53
:
: CLASS ACTION
:
: DEMAND FOR JURY TRIAL

**AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

JURISDICTION AND VENUE ....................................................................................... 4

PARTIES ........................................................................................................................... 6

SUBSTANTIVE ALLEGATIONS ................................................................................ 11

    A.  D-Market and Its Business ............................................................................ 11

    B.  The D-Market IPO ......................................................................................... 14

    C.  The Registration Statement Failed to Disclose That D-Market's Growth Had
    Sharply Decelerated During 2Q21, the Fiscal Quarter Immediately Preceding the
    IPO ...................................................................................................................... 16

    D.  The Registration Statement Failed to Disclose that Turkey's Reopening From
    COVID-19 in May 2021 Had and Would Continue to Negatively Impact D-
    Market .................................................................................................................. 18

    E.  The Registration Statement Failed to Disclose That D-Market Was Forced to
    Make Significant Investments and Customer Discounts in Order to Grow Revenue ....... 21

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN
    THE REGISTRATION STATEMENT ..................................................................... 23

CLASS ACTION ALLEGATIONS ............................................................................... 33

FIRST CAUSE OF ACTION ......................................................................................... 35

    For Violations of Section 11 of the 1933 Act Against All Defendants ............................ 35

SECOND CAUSE OF ACTION .................................................................................... 36

    For Violations of Section 15 of the 1933 Act Against D-Market, the Individual
    Defendants, Turkcommerce and Cogency ........................................................ 36

PRAYER FOR RELIEF .................................................................................................. 37

JURY TRIAL DEMANDED ........................................................................................... 38

Plaintiff James Benson ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings made by D-MARKET Elektronik Hizmetler ve Ticaret Anonim Şirketi ("D-Market" or the "Company"), and press releases, analyst reports, media reports, and other publicly disclosed reports and information about D-Market.  Plaintiff believes that substantial evidentiary support will exist for these allegations, which will be identified and developed after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a class action on behalf of all those who purchased the American Depositary Shares ("ADS") of D-Market in connection with the Company's July 1, 2021 initial public offering ("IPO"), pursuant and/or traceable to the Form 424B4 prospectus (the "Prospectus") and the Form DRS and Form F-1 registration statements, as amended (together with the Prospectus, the "Registration Statement"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act") against D-Market, certain of its officers and directors, the Company's authorized agent in the United States, a pre-IPO shareholder who offered D-Market ADS in the IPO, and the underwriters of the IPO (together, "Defendants").

2.     D-Market is an e-commerce company that operates in Turkey and is known as the "Amazon of Turkey."  At the time of the IPO, D-Market derived all of its revenue and profits from sales made by D-Market or third party merchants on the Company's various online platforms in Turkey.

Case 1:21-cv-08634-PKC    Document 49-13    Filed 04/15/22    Page 5 of 41

3.      On June 30, 2021 – the last day of the second fiscal quarter of 2021, the quarter ended June 30, 2021 ("2Q21") – the SEC declared D-Market's Form F-1 registration statement effective.  The next day – the first day of the third fiscal quarter of 2021, the quarter ended September 30, 2021 ("3Q21") – D-Market sold 41,670,000 ADS to the public in the IPO at a price of $12.00 per ADS and received net proceeds of approximately $475 million therefrom.  In addition, a large pre-IPO shareholder of D-Market, Turkcommerce B.V. ("Turkcommerce"), sold 23,581,000 ADS to the public in the IPO at a price of $12.00 per ADS and received net proceeds of approximately $268 million therefrom.

4.      The Registration Statement for the IPO was negligently prepared and, as a result, contained untrue statements of material fact and omitted to disclose material information that was required to be disclosed therein and was not prepared pursuant to the regulations governing its preparation.

5.      Specifically, Defendants failed to disclose material information regarding: (i) D-Market's substantial slowdown in growth in 2Q21, *i.e.*, before the IPO; (ii) the negative impact to D-Market's business and operations as of the IPO caused by Turkey's easing of COVID-19 lockdown restrictions, particularly the weekday reopening of marketplaces and shopping malls in May 2021; and (iii) D–Market's need to make significant investments and customer discounts as of the IPO to offset these negative developments.

6.      ***First***, before the IPO, and at the time of the IPO, D-Market's growth in 2Q21 had substantially slowed down compared to the Company's very strong historical growth that was positively and repeatedly discussed in the Registration Statement.  Because the IPO took place on the first day of 3Q21, this meant that Defendants had access to the full extent of D-Market's financial results for 2Q21.  Thus, by the time of the IPO, D-Market understood that the

- 2 -

Case 1:21-cv-08634-PKC   Document 49-13   Filed 04/15/22   Page 6 of 41

Company's growth had materially and significantly slowed. The Registration Statement, however, only discussed D-Market's "long history of strong growth," and negligently failed to disclose the substantial deceleration in growth that the Company was then-facing.

7.      *Second*, before the IPO, and at the time of the IPO, COVID-19 restrictions in Turkey that prevented Turkish citizens from leaving their homes and businesses from being open began to be significantly eased starting on May 17, 2021. This meant that Turkish citizens could be in public during daytime hours on weekdays and that marketplaces and shopping malls were reopened during these times. Because most of the Turkish retail market is concentrated on brick and mortar retailers, the reopening of Turkish marketplaces and shopping malls as of May 2021 posed a serious and substantial threat to D-Market, which had enjoyed a relative lack of competition from offline retailers while COVID-19 restrictions were in place. The Registration Statement negligently failed to disclose that marketplace and shopping mall restrictions had substantially eased in Turkey as of May 2021, or that this development had, and would continue to, negatively impacted D-Market's business and operations as of the IPO.

8.      *Third*, before the IPO, and at the time of the IPO, D-Market was forced to make significant investments and offer substantial customer discounts to combat the negative growth trends that were impacting the Company during 2Q21 and thereafter. The Registration Statement negligently failed to disclose that D-Market was forced to undertake these expensive remedial measures as of the IPO.

9.      Since the IPO, D-Market has twice reported disappointing financial results as it continues to be negatively impacted by a dramatic slowdown in growth, the lifting of COVID-19 restrictions in Turkey, and the resultant need for significant investments and customer discounts.

- 3 -

Case 1:21-cv-08634-PKC    Document 49-13    Filed 04/15/22    Page 7 of 41

10.     At the time of the filing of the initial action in this case, D-Market ADS traded at $7.01 per ADS, an approximate 41.5% decline from the IPO price. D-Market ADS have continued to significantly decline in market price, closing at $2.39 on December 9, 2021, an approximate 80.1% decline from the IPO price.

## JURISDICTION AND VENUE

11.     The claims alleged herein arise under Sections 11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.

12.     This Court has jurisdiction over the subject matter of this action pursuant to the New York Constitution, Article VI, §7(a), and Section 22 of the 1933 Act, which precludes removal to federal court.

13.     The Court has personal jurisdiction over all Defendants under N.Y. C.P.L.R. Sections 301 and 302, and venue is proper in this County pursuant to Section 22 of the 1933 Act.

14.     D-Market ADS publicly trade on the Nasdaq Global Select Market ("NASDAQ"), the New York-based exchange featured prominently in the Registration Statement. Defendants promoted the IPO and solicited investors to purchase the D-Market ADS intended to trade on such exchange in New York.

15.     All of the underwriters of the IPO are located in New York County, and are named herein as defendants, as follows: (i) Morgan Stanley & Co. LLC, with offices located at 1585 Broadway, New York, NY 10036; (ii) J.P. Morgan Securities LLC, with offices located at 277 Park Avenue, New York, NY 10172; (iii) Goldman, Sachs & Co. LLC, with offices located at 200 West Street, New York, NY 10282; (iv) BofA Securities, Inc., with offices located at 711 Fifth Avenue, New York, NY 10022; and (v) UBS Securities LLC, with offices located at 1285 Avenue of the Americas, New York, NY 10019.

- 4 -

16.     D-Market, Turkcommerce, and the Underwriter Defendants (defined below) entered into an underwriting agreement in connection with the IPO (the "Underwriting Agreement"), in which D-Market and Turkcommerce "submit[ted] to the exclusive jurisdiction of the . . . New York state courts in the Borough of Manhattan in The City of New York in any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. Each of the Company and the Selling Stockholder waive any objection which it may now or hereafter have to the laying of venue of any such suit or proceeding in such courts."

17.     Moreover, D-Market represented in the Underwriting Agreement that it: "has the power to submit, and pursuant to Section 18(c) of this Agreement, has legally, validly, effectively and irrevocably submitted, to the personal jurisdiction of each New York state . . . court sitting in the City of New York and has validly and irrevocably waived any objection to the laying of venue of any suit, action or proceeding brought in such court[.]"

18.     The depositary for D-Market ADS, which is the entity that holds the Class B ordinary shares of D-Market common stock that are represented by the ADS, is The Bank of New York Mellon ("BNY"), which is located in this County at 240 Greenwich Street, New York, NY 10286.  BNY has registered and delivered the ADS in this County.

19.     According to the deposit agreement governing the ADS (the "Deposit Agreement"), D-Market "consents and submits to the jurisdiction of . . . the Supreme Court of the State of New York, New York Country, in which any Proceeding may be instituted and the respective courts having jurisdiction to hear appeals from those courts[.]"

20.     In addition, the Underwriting Agreement states that "[D-Market] and [Turkcommerce] irrevocably appointed Cogency Global Inc., located at 122 East 42nd Street, 18th Floor, New York, New York 10168, United States, as its authorized agent in the Borough of

- 5 -

Manhattan in The City of New York upon which process may be served in any such suit or proceeding, and agrees that service of process upon such authorized agent, and written notice of such service to the Company or any such Selling Stockholder, as the case may be, by the person serving the same to the address provided in this Section 18(c), shall be deemed in every respect effective service of process upon the Company and such Selling Stockholder in any such suit or proceeding."

21.     Likewise, the Deposit Agreement states that D-Market "agrees that service of process upon said authorized agent shall be deemed in every respect effective service of process upon the Company in any Proceeding."

22.     Cogency Global Inc. ("Cogency"), the United States authorized agent for service for D-Market and Turkcommerce, is located in this County at 122 East 42nd Street, 18th Floor, New York, NY 10168.

23.     Accordingly, Defendants in large part conducted the IPO, drafted the Registration Statement, disseminated the allegedly misleading and incomplete statements identified herein, and solicited purchasers of D-Market ADS, in this County.

### PARTIES

24.     Plaintiff James Benson purchased D-Market ADS pursuant and/or traceable to the Registration Statement issued in connection with the IPO and has been damaged thereby.

25.     Defendant D-Market, based in Istanbul, Turkey, operates as an online e-commerce company.  D-Market is a dual stock company with Class A and Class B ordinary shares. The Class A ordinary shares are entitled to fifteen votes per share.  The Class B ordinary shares are entitled to one vote per share.  Each ADS sold in the IPO represents one Class B ordinary share.  D-Market ADS trade on the NASDAQ under the ticker symbol "HEPS."

- 6 -

26.     Defendant Mehmet Murat Emirdağ ("Emirdağ") has served as the Chief Executive Officer ("CEO") of D-Market and a member of its board of directors (the "Board") at all relevant times.  Emirdağ reviewed and signed the Registration Statement.

27.     Defendant Halil Korhan Öz ("Öz") has served as the Chief Financial Officer ("CFO") of D-Market and a member of its Board at all relevant times.  Öz reviewed and signed the Registration Statement.

28.     Defendant Hanzade Vasfiye Doğan Boyner ("Boyner") founded D-Market and has served as the Chairwoman of the Board at all relevant times.  Defendant Boyner beneficially owns all of the Company's Class A ordinary shares and, following the completion of the IPO, owns 10.4% of D-Market's Class B ordinary shares.  Together, Boyner's holdings of D-Market securities represent 71.1% of the Company's voting power.  As a result of Boyner's substantial holdings, the Registration Statements states that D-Market is "a 'controlled company' under the NASDAQ listing rules."

29.     Erman Kalkandelen ("Kalkandelen") was a D-Market director as of the IPO. Defendant Kalkandelen reviewed and signed and/or authorized signing of the Registration Statement.  Kalkandelen was also a Turkcommerce director as of the IPO.

30.     Mehmet Erol Çamur ("Çamur") was a D-Market director as of the IPO. Defendant Çamur reviewed and signed and/or authorized signing of the Registration Statement.

31.     Cemal Ahmet Bozer ("Bozer") was a D-Market director as of the IPO.  Defendant Bozer reviewed and signed and/or authorized signing of the Registration Statement.

32.     Vuslat Doğan Sabanci ("Sabanci") was a D-Market director as of the IPO. Defendant Sabanci reviewed and signed and/or authorized signing of the Registration Statement.

33. Mustafa Aydemir ("Aydemir") was a D-Market director as of the IPO. Defendant Aydemir reviewed and signed and/or authorized signing of the Registration Statement. Aydemir was also a Turkcommerce director as of the IPO.

34. Tolga Babali ("Babali") was a D-Market director as of the IPO. Defendant Babali reviewed and signed and/or authorized signing of the Registration Statement.

35. Defendants Emirdağ, Öz, Boyner, Kalkandelen, Çamur, Bozer, Sabanci, Aydemir, and Babali each signed the Company's Form F-1 registration statement, dated May 28, 2021. Nonetheless, the May 28, 2021 Form F-1 included the following Power of Attorney, which vested authority in defendants Emirdağ and Öz to sign as "attorney-in-fact" on behalf of these directors (defendants Boyner, Kalkandelen, Çamur, Bozer, Sabanci, Aydemir, and Babali) the other materials that, with the May 28, 2021 Form F-1, constitute the Registration Statement:

> [E]ach person whose signature appears below hereby constitutes and appoints Mehmet Murat Emirdağ and Halil Korhan Öz and each of them, individually, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead in any and all capacities, in connection with this registration statement, including to sign in the name and on behalf of the undersigned, this registration statement and any and all amendments thereto, including post-effective amendments and registrations filed pursuant to Rule 462 under the Securities Act of 1933, as amended, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the U.S. Securities and Exchange Commission, granting unto such attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or his substitute, may lawfully do or cause to be done by virtue hereof.

36. Defendant Tayfun Bayazit ("Bayazit") was a D-Market director-appointee as of the IPO. Defendant Bayazit is listed as such in the Registration Statement and, on June 17, 2021, provided his consent to be named as a nominee to the Board in the Registration Statement.

37.     Defendant Colleen A. De Vries ("De Vries") was, at all relevant times, D-Market's authorized United States representative in connection with her position as the Senior Vice President for defendant Cogency.  De Vries signed the May 28, 2021 Form F-1 and the June 17, 2021 and June 23, 2021 Form F-1/A registration statements.  De Vries presumably also reviewed and contributed to the Registration Statement as a signatory thereto.

38.     Defendants Emirdağ, Öz, Boyner, Kalkandelen, Çamur, Bozer, Sabanci, Aydemir, Babali, Bayazit, and De Vries are referred to herein as the "Individual Defendants."  As directors and/or executive officers and/or the authorized United States representative of the Company, the Individual Defendants participated in the solicitation and sale of D-Market ADS to investors in the IPO.  The Individual Defendants signed and/or authorized the signing of the Registration Statement.

39.     Defendant Cogency is located in New York, NY.  D-Market and Turkcommerce appointed Cogency as their agent for the service of process in the United States.  In turn, Cogency employed De Vries, who signed the Registration Statement at Cogency's direction and behalf and also on behalf of D-Market and Turkcommerce in connection with the IPO. Accordingly, Cogency is responsible and primarily liable for defendant De Vries' act of signing the Registration Statement, as well as any violation of the 1933 Act attributable to her, under the doctrine of respondeat superior.

40.     Defendant Turkcommerce is an investment vehicle incorporated under the laws of the Netherlands.  Turkcommerce is beneficially owned and controlled by Templeton Turkey Fund GP Ltd., and is managed pursuant to a limited partnership agreement among Templeton Turkey Fund GP Ltd., Templeton Turkey Fund, L.P. and Templeton Asset Management Ltd. Defendants Kalkandelen and Aydemir are both directors of Turkcommerce and D-Market, and

- 9 -

signed the Registration Statement at the direction of D-Market and Turkcommerce. According to the Registration Statement, Turkcommerce acquired 25% of the Company's Class B ordinary shares in February 2015 and is a party to a pre-IPO shareholders' agreement dated August 7, 2020 between defendant Boyner, members of her family, and defendant Sabanci (the "Pre-IPO Agreement"). The Pre-IPO Agreement sets forth the rights and obligations of, among other parties, Turkcommerce with respect to the issuance and transfer of D-Market ordinary shares. Accordingly, Turkcommerce is responsible and primarily liable for defendants Kalkandelen's and Aydemir's acts of signing the Registration Statement, as well as any violation of the 1933 Act attributable to them, under the doctrine of respondeat superior.

41. Defendants Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Goldman, Sachs & Co. LLC, BofA Securities, Inc. and UBS Securities LLC underwrote the IPO (the "Underwriter Defendants"). The Underwriter Defendants participated in preparing the Registration Statement, were required to conduct due diligence on D-Market and the IPO, and solicited investors to purchase D-Market ADS in the IPO. As indicated in the Registration Statement, the Underwriter Defendants agreed to purchase and/or received the following numbers of D-Market ADS in connection with the IPO, which they then sold and/or intended to sell to the investing public:[1]

---

[1] The Registration Statement only provides a breakdown among the Underwriter Defendants of the amount of D-Market ADS offered in the IPO without accounting for the subsequent exercise of the overallotment of 8,511,000 D-Market ADS sold by Turkcommerce.

| Underwriters | Number of ADSs |
|---|---|
| Morgan Stanley & Co. LLC | 23,263,400 |
| J.P. Morgan Securities LLC | 19,859,000 |
| Goldman, Sachs & Co. LLC | 9,078,400 |
| BofA Securities, Inc. | 2,269,600 |
| UBS Securities LLC | 2,269,600 |
| Total | 56,740,000 |

42.    D-Market, the Individual Defendants, Cogency, Turkcommerce, and the Underwriter Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. D-Market and Its Business

43.    D-Market, which also refers to itself as "Hepsiburada," describes itself in the Registration Statement as being the leading e-commerce provider in Turkey.  Colloquially known as the "Amazon of Turkey," D-Market was founded in 2000 by defendant Boyner.

44.    As the second most populous country in Europe with a population of 84 million as of December 31, 2020, the Registration Statement explains that Turkey presents a potentially attractive growth market for the Company's e-commerce platform.

45.    According to the Registration Statement, D-Market had 33 million members, 9 million active customers, and approximately 45,000 active merchants in Turkey in 2020.  The Registration Statement claims that D-Market "provide[s] high-quality customer experience by relentlessly focusing on selection, price and delivery[.]"

46.    Since its inception in 2000, D-Market has expanded its e-commerce platform, developing a wide ecosystem of services marketed to its customers.  These include:

- Hepsiburada: shop a wide range of products online;

- HepsiExpress: order groceries and essentials to be quickly delivered;

- HepsiPay: use different online payment options;

- 11 -

- HepsiGlobal: purchase products from non-Turkish merchants online; and

- HepsiFly: buy airline tickets online.

47.     In 2015, D-Market launched its "marketplace," which is an online space where third party merchants list and sell items to customers.  According to the Registration Statement, D-Market operates a hybrid model of first party sales made by the Company and third party sales made by merchants through the marketplace.  Previously, D-Market's platform only facilitated first party sales.  In 2020, approximately 59% of D-Market's gross merchandise value ("GMV") came from sales on the marketplace.

48.     The Registration Statement defines GMV as "the total value of orders/products sold through our platform over a given period of time (including value added tax ("VAT") without deducting returns and cancellations), including cargo income (shipping fees related to the products sold through our platform) and excluding other service revenues and transaction fees charged to our merchants[.]"  GMV is listed as a "key operating performance indicator" in the Registration Statement.

49.     The Registration Statement separately defines "Marketplace GMV" as "as total value of orders/products sold through our Marketplace over a given period of time (including value added tax ("VAT") without deducting returns and cancellations), including cargo income (shipping fees related to the products sold through our platform) and excluding other service revenues and transaction fees charged to our merchants[.]"  Marketplace GMV is listed as a "key operating performance indicator" in the Registration Statement.

50.     The Registration Statement repeatedly states that D-Market's "business has experienced a long history of strong growth as a result of our commitment to meticulous execution."

- 12 -

51. To emphasize that point, the Registration Statement repeatedly states that D-Market's "revenues increased by 66% to TRY 1.4 billion in the three months ended March 31, 2021 from TRY 0.8 billion in the three months ended March 31, 2020 and by 145% to TRY 6.4 billion in 2020 from TRY 2.6 billion in 2019, and by 33% from TRY 2.0 billion in 2018[.]"[2]

52. Likewise, the Registration Statement repeatedly states that D-Market's "total GMV increased by 95% to TRY 4.5 billion in the three months ended March 31, 2021 from TRY 2.3 billion in the three months ended March 31, 2020, and by 111% to TRY 17.0 billion in 2020 from TRY 8.0 billion in 2019, which was an increase of 56% from TRY 5.1 billion in 2018[.]"

53. According to the Registration Statement, D-Market's significant GMV growth in the recent periods preceding the IPO was "fueled by increasing purchase frequency, greater customer loyalty and an expanding pool of Active Customers[.]"

54. The Registration Statement further states that the financial metric known as "EBITDA" was important to D-Market because "it is a key measure used by our management and board of directors to evaluate our operating performance, generate future operating plans and make strategic decisions regarding the allocation of capital."

55. The Registration Statement defines "EBITDA" as "profit or loss for the period *plus* taxation on income *less* financial income *plus* financial expenses *plus* depreciation and amortization." (emphasis in original).

56. Accordingly, at the time of the IPO, the Company's revenue, GMV, and EBITDA were critical to D-Market's business, operations and financial performance, and were material to investors in the IPO.

---

[2]  References to "TRY" are to the Turkish Lira, the national currency of Turkey.  As of December 9, 2021, 1 TRY is equal to approximately $0.07 USD.

- 13 -

## B. The D-Market IPO

57.    Seeking to raise capital from public investors in the United Stated by listing D-Market ADS on a U.S. exchange, and seeking to provide liquidity for D-Market Class B ordinary shares held by Turkcommerce, D-Market and Turkcommerce, with the assistance of the Individual Defendants, Cogency and the Underwriter Defendants, sought to publicly list a portion of D-Market's equity on the NASDAQ in New York.   With the assistance of the Underwriter Defendants, Defendants caused D-Market to complete the lucrative IPO.

58.    Before the IPO, D-Market was not publicly listed on any securities exchange in the world.

59.    On March 19, 2021, D-Market filed a draft registration statement with the SEC on Form DRS.   On May 10, 2021, D-Market filed an amended registration statement on Form DRS/A.

60.    On May 28, 2021, D-Market filed a draft registration statement with the SEC on Form F-1.   Thereafter, D-Market filed amendments on Form F-1/A on June 17, 2021, and June 23, 2021.

61.    According to the Prospectus, filed with the SEC on Form 424B4 on July 1, 2021, 56,740,000 D-Market ADS were issued in the IPO at $12.00 per ADS.  Each ADS represents one Class B ordinary share of D-Market common stock.

62.    Of this amount, D-Market offered 41,670,000 ADS.

63.    The SEC declared the registration statement effective on June 30, 2021 at 4:30 p.m. ET.   On July 1, 2021, Defendants priced D-Market ADS at $12.00 per ADS and filed the final prospectus for the IPO on Form 424B4.  D-Market ADS began trading on the NASDAQ on July 1, 2021.

Case 1:21-cv-08634-PKC    Document 49-13    Filed 04/15/22    Page 18 of 41

64.     Notably, the Registration Statement cautioned investors to rely only on the information contained therein when determining whether to invest in the IPO, providing, in bold text, as follows:

> **We are responsible for the information contained in this prospectus. Neither we nor the Selling Shareholder have authorized anyone to provide you with different information, and neither we nor the Selling Shareholder take responsibility for any other information others may give you. We, the Selling Shareholder and the underwriters are not making an offer to sell, or seeking offers to buy, these securities in any jurisdiction where the offer or sale is not permitted.**

(emphasis in original).

65.     On July 1, 2021, Defendants completed the IPO, generating approximately $475 million in net proceeds for D-Market after underwriting discounts and commissions and estimated offering costs.

66.     According to the Prospectus, Turkcommerce offered 15,070,000 ADS at the IPO price of $12.00 per ADS.

67.     D-Market granted the Underwriter Defendants a 30-day option after the IPO to purchase up to 8,511,000 additional D-Market ADS from Turkcommerce at the IPO price of $12.00 per share, less underwriting discounts and commissions of $0.60 per share.

68.     On July 8, 2021, D-Market filed a Form 6-K and announced that the Underwriter Defendants had exercised this option, meaning Turkcommerce offered 23,581,000 D-Market ADS in the IPO (the 15,070,000 D-Market ADS listed in the Prospectus plus the 8,511,000 additional D-Market ADS).

69.     Thus, the IPO generated approximately $268 million in net proceeds for Turkcommerce after underwriting discounts and commissions and estimated offering costs.

70.     D-Market did not receive any of the proceeds from the ADS offered by Turkcommerce in the IPO.

- 15 -

Case 1:21-cv-08634-PKC   Document 49-13   Filed 04/15/22   Page 19 of 41

71.    As a result of the IPO, Turkcommerce's ownership of D-Market's Class B ordinary shares declined from 25% before the IPO to 17.2% after the IPO.

72.    In connection with the IPO, the Underwriter Defendants each purchased and sold millions of D-Market ADS and received approximately $39 million in underwriting discounts and commissions from the Company and Turkcommerce.

73.    By virtue of the IPO, D-Market became the first Turkish company to be publicly traded on the NASDAQ.

74.    Following the IPO, the market price of D-Market ADS has declined precipitously. As of September 28, 2021, the date upon which the initial complaint in this litigation was filed, D-Market ADS closed at $7.01, a decline of $4.99 from the IPO price, or approximately 41.5%.

75.    D-Market ADS have continued to significantly decline in market price, closing at $2.39 on December 9, 2021, an approximate 80.1% decline from the IPO price.

## C.  The Registration Statement Failed to Disclose That D-Market's Growth Had Sharply Decelerated During 2Q21, the Fiscal Quarter Immediately Preceding the IPO

76.    According to the Registration Statement, D-Market's strong growth was a critical and central feature of the Company's value proposition to investors.  For example, the Registration Statement prominently states numerous times that "[o]ur business has experienced a long history of strong growth as a result of our commitment to meticulous execution."

77.    Given the importance to investors of D-Market reliably generating strong growth, the Registration Statement repeatedly recites the Company's recent positive revenue and GMV performance in fiscal years 2020, 2019, and 2018.  Thus, the Registration Statement informed investors that maintaining strong growth was critical to D-Market's operations and business.

78.    Before the IPO, however, and unbeknownst to investors, D-Market experienced a sharp decline in operational and sales growth in 2Q21.  This significant change was not disclosed

- 16 -

Case 1:21-cv-08634-PKC    Document 49-13    Filed 04/15/22    Page 20 of 41

in the Registration Statement and was therefore unknown to investors who purchased D-Market ADS in the IPO – including those who purchased their ADS after the IPO, but pursuant and/or traceable to the Registration Statement.

79.     Indeed, the IPO took place on July 1, 2021 – meaning **after** the conclusion of 2Q21.  As a result, Defendants necessarily understood the full extent of the Company's financial performance in 2Q21 as of the IPO, including, but not limited to, D-Market's poor performance in terms of revenue, GMV and EBITDA, and the underlying reasons for that poor performance.

80.     Indeed, as an e-commerce company with significant technological capabilities, D-Market had sophisticated technology at its disposal as of the IPO to understand their revenue volumes at the moment that sales occur on the Company's various platforms.  According to the Registration Statement, D-Market is "a technology-driven company and have invested heavily in developing our own highly scalable proprietary technology to support the large and rapidly growing order volumes generated on our platform."  Thus, by July 1, 2021, D-Market would have had access to its financial performance in 2Q21.

81.     On August 26, 2021, D-Market issued an earnings press release to investors on Form 6-K (the "8/26/2018 Form 6-K") for the first time as a publicly traded company.  The 8/26/2021 Form 6-K stated, *inter alia*, that the Company's revenue growth in 2Q21 was only 5.2%, significantly below the 66% revenue growth experienced in the prior quarter, the first fiscal quarter of 2021, the quarter ended March 31, 2021 ("1Q21").

82.     In addition, the 8/26/2021 Form 6-K stated, *inter alia*, that GMV only grew by 38.2% in 2Q21 – less than half of the 95% GMV growth that the Registration Statement highlighted from 1Q21.

- 17 -

83.     Likewise, the 8/26/2021 Form 6-K stated, *inter alia*, that EBITDA was negative TRY 188.6 million, a significant decline from the positive TRY 71.1 million in EBITDA generated by D-Market in the second fiscal quarter of 2020, the quarter ended March 31, 2020.

84.     Thus, through the 8/26/2021 Form 6-K, D-Market acknowledged – merely 56 days after the IPO – that the Company's "long history of strong growth" had ended as of 2Q21.

85.     D-Market's undisclosed slowdown in growth, which was directly contrary to numerous representations in the Registration Statement, continued in 3Q21.  Specifically, in D-Market's second-ever quarterly earnings press release, filed on Form 6-K on November 23, 2021 (the "11/23/2021 Form 6-K"), the Company reported a decline in revenue of 0.8%, GMV of 49.8%, and EBITDA of negative TRY 659.4 million.

86.     Accordingly, the Registration Statement was materially false and misleading because it failed to disclose D-Market's sharp deceleration of growth in 2Q21.

**D.  The Registration Statement Failed to Disclose that Turkey's Reopening From COVID-19 in May 2021 Had and Would Continue to Negatively Impact D-Market**

87.     The Registration Statement discusses the positive impact that COVID-19 had on D-Market's business and operations beginning in March 2020, explaining that the pandemic "resulted in a major increase in demand for e-commerce services in Turkey[.]"

88.     The Registration Statement also inaccurately and incompletely warns that a potential post-IPO risk is that "customers *may* shift back towards offline retailers as social distancing and government restrictions ease, as a result of which we *may* experience slower than expected growth." (emphasis added).

89.     The first case of COVID-19 in Turkey was recorded on March 11, 2020 and the first death due to COVID-19 in the country occurred on March 15, 2020.  Starting on March 16, 2020, the Turkish Minister of the Interior ordered businesses and places of worship to

- 18 -

INDEX NO. 655701/2021
RECEIVED NYSCEF: 01/26/2022

halt indoor activities.  With that announcement, more than 80 million people in Turkey started to live under some form of restrictions.

90.      On March 21, 2020, the Turkish Minister of the Interior announced a total curfew for those aged 65 or older and persons whose immune system were compromised due to "chronic pulmonary diseases, asthma, COPD, cardiovascular disease, kidney disease, hypertension, and liver disease."

91.      On April 3, 2020, citing the potential for asymptomatic transmission of COVID-19 by children, the Turkish Ministry of Health extended the curfew to people 20 years of age and younger.  In a televised address on the same day, the Turkish President announced measures prohibiting entry into and exit from Turkey's largest cities, including the commercial hub Istanbul, for 15 days.

92.      After easing certain lockdown measures in late summer 2020, in November 2020 the Turkish Ministry of Health reinstated the curfew for people aged 65 and older and people aged 20 and younger as COVID-19 cases again began to increase.  The Turkish Minister of Internal Affairs also ordered businesses and places of worship to again halt indoor activities.

93.      Beginning in May 2021, the Turkish government began easing its COVID-19 restrictions for all Turkish citizens.

94.      According to ABC News and Reuters, as of May 17, 2021, the Turkish Minister of the Interior eased the full lockdown that ordered Turkish citizens to stay home and most businesses to remain closed, and switched to a less restrictive program that only imposed curfews on weeknights and weekends.

Case 1:21-cv-08634-PKC    Document 49-13    Filed 04/15/22    Page 23 of 41

95.     According to ABC News and the Associated Press, among other things, as of May 17, 2021, Turkish shopping malls reopened and Turkish citizens were permitted to return to their workplaces during weekday daytime hours.

96.     According to a circular issued by the Turkish government on May 17, 2021, marketplaces were permitted to reopen during weekdays from 7:00 to 19:00.

97.     According to a circular issued by the Turkish government on May 31, 2021, marketplaces were permitted to reopen during weekdays and Saturdays from 7:00 to 20:00.

98.     According to Reuters, on June 21, 2021, the Turkish President announced that Turkey will further relax its COVID-19 restrictions starting on July 1, 2021, by, among other things, removing the remaining restriction on marketplaces – *i.e.*, allowing them to open on Sundays and to expand their hours beyond 7:00 to 20:00.

99.     Turkey's lifting of the weekday COVID-19 restrictions and weekday reopening of marketplaces and shopping malls in May 2021, *i.e.*, during 2Q21, was a materially negative development for D-Market.  Indeed, the Registration Statement states that D-Market only has an approximate 2% market share of Turkey's retail market, and that this market is "dominated by offline retail players," meaning brick and mortar stores in marketplaces and shopping malls.

100.    In other words, the easing of COVID-19 restrictions before the IPO, especially the reopening of Turkish marketplaces and shopping malls during weekdays and Saturdays, posed a material threat to D-Market's competitive position in the Turkish retail market.

101.    The Registration Statement did not disclose to investors who purchased D-Market ADS in the IPO – including those who purchased their shares after the IPO, but pursuant and/or traceable to the Registration Statement – that Turkish marketplaces and shopping malls had mostly reopened during 2Q21.

102.    In the announcement of D-Market's 2Q21 financial results, however, the Company acknowledged in the 8/26/2021 Form 6-K that its business and operations were being negatively impacted by "the lift-off of lock-down measures" imposed by the Turkish government in response to COVID-19.

103.    In the accompanying investor conference call held the same day, defendant Emirdağ admitted that "the lift-off of lock-down measures" had "adversely impacted consumer behavior in online shopping."

104.    Then, in a Form 6-K filed by D-Market on November 12, 2021, the Company acknowledged that the lifting of COVID-19 restrictions in Turkey caused "the growth of online card spending in Turkey [to] slow[] down substantially."

105.    Likewise, in the 11/23/2021 Form 6-K, defendant Emirdağ admitted that "online consumer activity slowing" was directly related to the lifting of COVID-19 restrictions in Turkey.

106.    Thus, the Registration Statement was materially false and misleading because it failed to disclose that Turkey's COVID-19 restrictions for marketplaces and shopping malls had mostly been lifted before the IPO, and that this change was negatively impacting D-Market's business and operations as of the IPO.

**E.  The Registration Statement Failed to Disclose That D-Market Was Forced to Make Significant Investments and Customer Discounts in Order to Grow Revenue**

107.    The Registration Statement provides specific details about the sources of D-Market's purported "strong growth."  Specifically, the Registration Statement states that such growth was "fueled by increasing purchase frequency, greater customer loyalty and an expanding pool of Active Customers of 9 million in 2020, up from 6.5 million in 2019 and 4.8 million in 2018, with a compound annual growth rate [] of 38% from 2018 to 2020."

- 21 -

108. Likewise, the Registration Statement states that "[t]he growth has been fueled by several factors, including an increased frequency of orders to 3.9 in 2020, up from 3.5 in 2019 and 3.1 in 2018, and an expanding Active Customer base of 9 million in 2020, up from 6.5 million in 2019 and 4.8 million in 2018."

109. Moreover, the Registration Statement represented that these factors would purportedly continue to contribute to D-Market's alleged strong growth following the IPO, stating that "[a]s we continue to scale up Hepsiburada, we believe that these trends will continue to positively impact our business, with further Active Customer base growth, strong cohort performance and increasing operational efficiency driving improvement in unit economics and profitability."

110. As explained above in ¶¶76-106, however, D-Market's growth had substantially slowed during 2Q21, and has remained slowed ever since. Moreover, the Company has been negatively impacted by the easing of COVID-19 lockdown measures for marketplaces and shopping malls that began to be lifted in May 2021.

111. In addition, the 8/26/2021 Form 6-K attributed D-Market's decline in growth in 2Q21 to "investments to fortify our market position in electronics, investments to penetrate in high frequency categories as well as higher customer demand for low margin products."

112. Likewise, the 8/26/2021 Form 6-K disclosed that there were "discounts given to our customers for temporary marketing campaigns" that contributed to D-Market's poor revenue performance in 2Q21.

113. In the accompanying investor conference call held by D-Market on August 26, 2021, defendant Öz admitted that a contributing factor to D-Market's deceleration in growth in 2Q21 was "discounts given to our customers to . . . widen our selection with

- 22 -

expanding merchant base and competitive prices in the markets by our strategic margin investments as well as discounts given to our customers for temporary marketing campaigns."

114. In addition, in commenting on D-Market's 3Q21 results in the 11/23/2021 Form 6-K, defendant Emirdağ acknowledged that the Company had "observed challenging market conditions with competition intensifying[.]"

115. In the accompanying earnings conference call held on November 23, 2021, defendant Emirdağ admitted that "we, the Hepsiburada team, acknowledge the concerns of the market. Given the headwinds we previously reported on, we had a challenging Q3 and fell behind our expectations in GMV and EBITDA."

116. During that same call, defendant Emirdağ admitted that "we heavily used customer discounts to stimulate the demand in the market."

117. In addition, in the 11/23/2021 Form 6-K, defendant Emirdağ admitted that the Company's growth problems in 2Q21 and thereafter required the Company to engage in "increasing total customer discounts and expanding advertising and marketing spend."

118. Thus, the Registration Statement was materially false and misleading because it failed to disclose that D-Market's slowdown in growth in 2Q21 caused the Company to make expensive investments and customer discounts that further negatively impacted D-Market's business and operations.

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT**

119. As set forth above, the Registration Statement was negligently prepared and omitted material information and contained misleading statements about significant, then-existing matters that made the IPO speculative or risky.

- 23 -

Case 1:21-cv-08634-PKC    Document 49-13    Filed 04/15/22    Page 27 of 41

120. In the Registration Statement, Defendants positively and repeatedly discussed D-Market's purported "long history of strong growth" as being a critical component of the Company's value proposition to investors. The Registration Statement represented, in pertinent part, as follows:

> Our business has experienced a long history of strong growth as a result of our commitment to meticulous execution.

> *       *       *

> Our business has grown substantially in recent years.

> *       *       *

> Highly attractive financial profile with strong growth at scale[.]

121. By speaking about the topic of D-Market's purported "long history of strong growth" in the statements in ¶120 above, Defendants had a duty to speak fully and truthfully. Because Defendants failed to disclose that: (i) D-Market had suffered a sharp decline in sales growth in 2Q21; (ii) the easing of COVID-19 restrictions for marketplaces and shopping malls in May 2021 had, and would continue to, negatively impacted Turkish consumer use of e-commerce platforms and, consequently, D-Market's ability to grow; and (iii) as a result of the foregoing, D-Market was forced to increase its investments and customer discounting, all of which negatively impacted D-Market's operations and financial performance, these statements omitted material information from investors in D-Market ADS in or traceable to the IPO, thereby rendering these statements materially incomplete and misleading.

122. The Registration Statement also positively and repeatedly discussed D-Market's recent revenue and GMV performance as being proof of the Company's purported "long history of strong growth." The Registration Statement represented, in pertinent part, as follows:

> [R]evenues increased by 66% to TRY 1.4 billion in the three months ended March 31, 2021 from TRY 0.8 billion in the three months ended March 31, 2020 and by

- 24 -

145% to TRY 6.4 billion in 2020 from TRY 2.6 billion in 2019, and by 33% from TRY 2.0 billion in 2018[.]

\* \* \*

[T]otal GMV increased by 95% to TRY 4.5 billion in the three months ended March 31, 2021 from TRY 2.3 billion in the three months ended March 31, 2020, and by 111% to TRY 17.0 billion in 2020 from TRY 8.0 billion in 2019, which was an increase of 56% from TRY 5.1 billion in 2018[.]

\* \* \*

[M]eticulous execution is indispensable to operate in Turkey, where we operate a 1P and 3P hybrid model and as a result recorded a GMV CAGR of 64% (11.8 times) (to TRY 17.0 billion in 2020 from TRY 1.4 billion in 2015), a growth in the number of Active Customers of 4.4 times from 2015 to 2020 and a GMV per Active Customer growth at a CAGR of 32% from 2018 to 2020[.]

123.    By speaking about the topic of D-Market's purported "meticulous execution" and the Company's financial performance in 1Q21 in the statements in ¶122 above, Defendants had a duty to speak fully and truthfully.  Because Defendants failed to disclose that: (i) D-Market had suffered a sharp decline in sales growth in 2Q21; (ii) the easing of COVID-19 restrictions for marketplaces and shopping malls in May 2021 had, and would continue to, negatively impacted Turkish consumer use of e-commerce platforms and, consequently, D-Market's ability to grow; and (iii) as a result of the foregoing, D-Market was forced to increase its investments and customer discounting, all of which negatively impacted D-Market's operations and financial performance, these statements omitted material information from investors in D-Market ADS in or traceable to the IPO, thereby rendering these statements materially incomplete and misleading.

124.    The Registration Statement also repeatedly discussed the sources of D-Market's purported "long history of strong growth."  Specifically, the Registration Statement represented, in pertinent part, as follows:

[D-Market's growth was] fueled by increasing purchase frequency, greater customer loyalty and an expanding pool of Active Customers of 9 million in

- 25 -

Case 1:21-cv-08634-PKC    Document 49-13    Filed 04/15/22    Page 29 of 41

2020, up from 6.5 million in 2019 and 4.8 million in 2018, with a compound annual growth rate [] of 38% from 2018 to 2020.

\* \* \*

The growth has been fueled by several factors, including an increased frequency of orders to 3.9 in 2020, up from 3.5 in 2019 and 3.1 in 2018, and an expanding Active Customer base of 9 million in 2020, up from 6.5 million in 2019 and 4.8 million in 2018.

125. By speaking about the topic of D-Market's purported sources of the Company's alleged "long history of strong growth" in the statements in ¶124 above, Defendants had a duty to speak fully and truthfully. Because Defendants failed to disclose that: (i) D-Market had suffered a sharp decline in sales growth in 2Q21; (ii) the easing of COVID-19 restrictions for marketplaces and shopping malls in May 2021 had, and would continue to, negatively impacted Turkish consumer use of e-commerce platforms and, consequently, D-Market's ability to grow; and (iii) as a result of the foregoing, D-Market was forced to increase its investments and customer discounting, all of which negatively impacted D-Market's operations and financial performance, these statements omitted material information from investors in D-Market ADS in or traceable to the IPO, thereby rendering these statements materially incomplete and misleading.

126. The Registration Statement also represented that D-Market's purported "long history of strong growth," and the identified sources of that alleged growth in the Registration Statement, would continue to positively impact the Company following the IPO. Specifically, the Registration Statement represented, in pertinent part, as follows:

As we continue to scale up Hepsiburada, we believe that these trends will continue to positively impact our business, with further Active Customer base growth, strong cohort performance and increasing operational efficiency driving improvement in unit economics and profitability.

127. By speaking about the topic of D-Market's belief that the Company's strong growth, and the alleged sources of that growth, would continue following the IPO in the

- 26 -

Case 1:21-cv-08634-PKC    Document 49-13    Filed 04/15/22    Page 30 of 41

statements in ¶126 above, Defendants had a duty to speak fully and truthfully. Because Defendants failed to disclose that: (i) D-Market had suffered a sharp decline in sales growth in 2Q21; (ii) the easing of COVID-19 restrictions for marketplaces and shopping malls in May 2021 had, and would continue to, negatively impacted Turkish consumer use of e-commerce platforms and, consequently, D-Market's ability to grow; and (iii) as a result of the foregoing, D-Market was forced to increase its investments and customer discounting, all of which negatively impacted D-Market's operations and financial performance, these statements omitted material information from investors in D-Market ADS in or traceable to the IPO, thereby rendering these statements materially incomplete and misleading.

128.    In addition to the Registration Statement negligently failing to advise investors about significant, then-existing matters that made the IPO speculative or risky, the Registration Statement was also negligently prepared because it omitted to disclose material information that was required to be disclosed pursuant to the regulations governing the preparation of the Registration Statement.

129.    Part I of Form F-1, entitled "Information Required in Prospectus," governs the nature and content of information an issuer must disclose in connection with an offering, such as the IPO. Item 4 of Part I, entitled "Information with Respect to the Registrant and the Offering," requires, in subpart (a) thereof, disclosure of the "[i]nformation required by Part I of Form 20-F."

130.    In turn, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods*." (emphasis in original). Specifically, Item 5(D), entitled "Trend information," provides, in full, as follows:

- 27 -

The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. ***The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition***.

(emphasis added).

131.    The scope of the information whose disclosure is required under this paragraph on trends, uncertainties and events is coextensive with that required under Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

132.    Thus, for example, in May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects***, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

*    *    *

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

133.    The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)    Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

- 28 -

(2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

134.    Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F."  In particular, the SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release as support and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – i.e., reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

135.    Furthermore, in adopting amendments in 2003 to its rules to require disclosure of off-balance sheet arrangements for domestic and foreign issuers, the SEC recognized that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies."  Because Form F-1 incorporated the MD&A requirements from Form 20-F, and those requirements are the same for domestic issuers, the Registration Statement required disclosure of trends, events and uncertainties contemplated by Item 303(a) of Regulation S-K.

136.    Accordingly, D-Market had an affirmative obligation to disclose facts in the Registration Statement required by Item 303, including information regarding known trends,

- 29 -

uncertainties, or events. The Registration Statement, however, failed to disclose such information, which was known by Defendants at the time of the IPO, including that:

(a)    D-Market had suffered a sharp decline in sales growth in 2Q21;

(b)    the easing of COVID-19 restrictions for marketplaces and shopping malls in May 2021 had, and would continue to, negatively impacted Turkish consumer use of e-commerce platforms and, consequently, D-Market's ability to grow; and

(c)    as a result of the foregoing, D-Market was forced to increase its investments and customer discounting.

137.    The Registration Statement similarly failed to disclose information on some of the most material risks facing D-Market at the time of the IPO. Pursuant to Item 3 of SEC Form F-1, the Registration Statement was required to furnish the necessary information required by Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, which governs disclosure of risk factors and requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make [the securities] speculative or risky."

138.    Specifically, Item 105 requires the issuer to "[e]xplain how each risk affects the registrant or the securities[.]"

139.    Because D-Market derived all of its revenue, GMV, and EBITDA at the time of the IPO from sales on its various platforms, information regarding the Company's ability to profitably grow such sales was among the most significant factors making an investment in D-Market ADS risky at the time of the IPO. Defendants failed to comply with Item 105 by failing to adequately disclose risk factors or material changes in risk factors in the Registration Statement. Specifically, Defendants failed to disclose in the Registration Statement that:

(a)    D-Market had suffered a sharp decline in sales growth in 2Q21;

- 30 -

(b)    the easing of COVID-19 restrictions for marketplaces and shopping malls in May 2021 had, and would continue to, negatively impacted Turkish consumer use of e-commerce platforms and, consequently, D-Market's ability to grow; and

(c)    as a result of the foregoing, D-Market was forced to increase its investments and customer discounting.

140.    Furthermore, even though the Registration Statement may have contained purported risk warnings, such risk disclosures did not adequately warn investors about the materially false and misleading statements or omissions alleged herein.

141.    Specifically, the risk disclosures included in the Registration Statement failed to advise investors about significant, then-existing (as opposed to potential) factors that made the IPO speculative or risky.

142.    Thus, rather than accurately warning investors of the risks associated with purchasing D-Market ADS, the risk disclosures in the Registration Statement served to misinform and mislead investors, thereby rendering them materially incomplete and misleading in violation of the 1933 Act.

143.    The Registration Statement recites *potential* risks associated with the easing of COVID-19 lockdown restrictions in Turkey.  Specifically, the Registration Statement stated, in pertinent part, as follows:

> COVID-19 and the measures taken to limit its spread have impacted consumer behavior, including e-commerce shopping trends. During the COVID-19 pandemic, increased numbers of consumers in the Turkish market have shifted to e-commerce as a result of social distancing and other government restrictions, which resulted in the growth for demand for our products and services. However, *customers may shift back towards offline retailers as social distancing and government restrictions ease, as a result of which we may experience slower than expected growth*. Moreover, as the full impact of the COVID-19 pandemic continues to evolve, *it is uncertain what effect the pandemic will have on consumer behavior and the demand for various goods and services may evolve*.

- 31 -

> For instance, e-commerce orders for groceries and other essential products have increased significantly during the pandemic, and the risk that this trend reverses or otherwise alters in the future cannot be excluded.

(emphasis added).

144.    The statements above in ¶143 were inaccurate statements of material fact because the Registration Statement failed to disclose the significant then-existing, as opposed to potential, risks associated with the easing of lockdown restrictions in Turkey.  As discussed above, weekday restrictions for marketplaces and shopping malls were lifted in Turkey on May 17, 2021, and Saturday restrictions for marketplaces and shopping malls were lifted in Turkey on June 1, 2021.  Thus, the Registration Statement fails to disclose that the major offline Turkish retailers – marketplaces and shopping malls – began directly competing with D-Market again during 2Q21, meaning that D-Market's competitive landscape had substantially deteriorated as of the IPO. Moreover, the Registration Statement failed to disclose that: (i) D-Market had suffered a sharp decline in sales growth in 2Q21; (ii) the easing of COVID-19 restrictions for marketplaces and shopping malls in May 2021 had, and would continue to, negatively impacted Turkish consumer use of e-commerce platforms and, consequently, D-Market's ability to grow; and (iii) as a result of the foregoing, D-Market was forced to increase its investments and customer discounting, all of which negatively impacted D-Market's competitive position in the Turkish retail market.

145.    Likewise, the Registration Statement also recites *potential* risks associated with D-Market's competitive environment.  Specifically, the Registration Statement stated, in pertinent part, as follows:

> We operate in a highly competitive market, and in the future we may not be able to compete effectively.

\*    \*    \*

> [W]e may fail to retain or may lose our current market position, we may fail to continue to attract new and retain our existing customers and merchants, and we may be required to increase our spending or maintain lower prices

146. The statements above in ¶145 were incomplete statements of material fact because the Registration Statement failed to disclose the significant then-existing, as opposed to potential, risks associated with competition in the Turkish retail market. The Registration Statement failed to disclose that: (i) D-Market had suffered a sharp decline in sales growth in 2Q21; (ii) the easing of COVID-19 restrictions for marketplaces and shopping malls in May 2021 had, and would continue to, negatively impacted Turkish consumer use of e-commerce platforms and, consequently, D-Market's ability to grow; and (iii) as a result of the foregoing, D-Market was forced to increase its investments and customer discounting, all of which negatively impacted D-Market's competitive position in the Turkish retail market.

## CLASS ACTION ALLEGATIONS

147. Plaintiff brings this action as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules on behalf of a class consisting of all those who purchased D-Market ADS pursuant and/or traceable to Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are Defendants and their families; the officers, directors, and affiliates of Defendants and members of their immediate families; the legal representatives, heirs, successors, or assigns of any of the foregoing; and any entity in which any Defendant has or had a controlling interest.

148. The members of the Class are so numerous that joinder is impracticable. The IPO involved the issuance and sale of over 65 million D-Market ADS, which have been publicly traded on the NASDAQ following the IPO. While the exact number of Class members is unknown to Plaintiff at this time and must be ascertained through discovery, Plaintiff believes there are hundreds, if not thousands, of members in the Class. The members of the Class may be

- 33 -

identified from records maintained by D-Market, its depositary bank (BNY), or others, and may receive notice of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

149.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the common questions of law and fact are:

(a)    whether Defendants violated the 1933 Act;

(b)    whether the Registration Statement misrepresented and/or omitted material information in violation of the 1933 Act; and

(c)    whether and to what extent Class members have sustained damages and the proper measure of damages.

150.    Plaintiff's claims are typical of the claims of the Class, as all Class members were and are similarly affected by Defendants' conduct.  Plaintiff is not subject to any atypical defenses.

151.    Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class action litigation.

152.    A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the alleged wrongs done to them.  There will be no difficulty in managing this action as a class action.

- 34 -

Case 1:21-cv-08634-PKC    Document 49-13    Filed 04/15/22    Page 38 of 41

# FIRST CAUSE OF ACTION

## For Violations of Section 11 of the 1933 Act
## Against All Defendants

153.    Plaintiff repeats, realleges and incorporates each allegation above as if set forth below.

154.    This Cause of Action is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

155.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

156.    Defendants are strictly liable to Plaintiff and the Class for these misstatements and omissions.

157.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

158.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the 1933 Act.

159.    Plaintiff acquired D-Market ADS pursuant and/or traceable to Registration Statement issued in connection with the IPO.

160.    Plaintiff and the Class have sustained damages.  The value of D-Market ADS has declined substantially subsequent to, and due to, Defendants' violations.

161.    At the time of their purchases of D-Market ADS, Plaintiff and other members of the Class were without knowledge of the facts described herein and could not have reasonably discovered those facts before the disclosures described herein.

- 35 -

162.    Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this Complaint is based to the time that Plaintiff commenced this action.

163.    Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

**For Violations of Section 15 of the 1933 Act
Against D-Market, the Individual Defendants, Turkcommerce and Cogency**

164.    Plaintiff repeats, realleges and incorporates each allegation above as if set forth below.

165.    This Cause of Action is brought pursuant to Section 15 of the 1933 Act, 15 U.S.C. §77o, against D-Market, the Individual Defendants, Turkcommerce and Cogency.

166.    Where a violation of Section 11 occurs, Section 15 gives rise to liability as to "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [Section 11] . . . ." 15 U.S.C. §77o(a).

167.    Additionally, control persons under Section 15 are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." *Id.*

168.    As detailed herein, each of Defendants committed primary violations of the 1933 Act, are directly responsible and primarily liable for any such violations, or employed a primary violator.

- 36 -

Case 1:21-cv-08634-PKC Document 49-13 Filed 04/15/22 Page 40 of 41

169. The Individual Defendants each were control persons of D-Market by virtue of their positions as directors and/or senior executive officers of D-Market and/or Turkcommerce and/or as the authorized United States representative of D-Market at the time of the preparation of the Registration Statement and as of the IPO. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of D-Market.

170. D-Market controlled all of the Individual Defendants.

171. Turkcommerce controlled Kalkandelen and Aydemir.

172. Cogency controlled De Vries.

173. By reason of the conduct alleged herein, D-Market, the Individual Defendants, Turkcommerce and Cogency violated Section 15 of the 1933 Act, and Plaintiff and the Class have sustained damages as a result.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel at Robbins Geller Rudman & Dowd LLP and Johnson Fistel, LLP as co-Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other or different relief as the Court may deem just and proper.

- 37 -

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  December 10, 2021

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
MICHAEL G. CAPECI

/s/ Michael G. Capeci

MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mcapeci@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR. (*pro hac vice*
forthcoming)
40 Powder Springs Street
Marietta, GA 30064
Telephone:  470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

JOHNSON FISTEL, LLP
RALPH M. STONE
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: 212/292-5690
212/292-5680 (fax)
ralphs@johnsonfistel.com

*Attorneys for Plaintiff*

- 38 -